No. 3--05--0292

Filed June 26, 2007.

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court for the 21st Judicial Circuit, Kankakee County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.   02-CF-116 |
| TODD SAXON, | ) ) | Honorable Gordon S. Lustfeldt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the opinion of the court:

Defendant Todd Saxon was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)), arson (720 ILCS 5/20-1(a) (West 2004)), and concealment of homicidal death (720 ILCS 5/9-3.1(a) (West 2004)) following a jury trial.  Defendant now appeals that conviction, contending that he was not proven guilty of the offenses beyond a reasonable doubt.

FACTS

Victim O.W., a 12-year-old girl, was found stabbed to death inside a garage that had been burned down in Kankakee, Illinois, on March 30, 1995.  Defendant Todd Saxon was charged with first degree murder, arson, and concealment of a homicide on February 26, 2002, in connection with O.W.'s death.  Specifically, defendant was charged with three counts of first degree murder on the

1

theories that he intended to kill O.W. by stabbing her, that he stabbed her knowing such act created a strong possibility of death or great bodily harm, and that he killed her during the course of a felony, criminal sexual assault. He was also charged with arson in that he knowingly damaged a building at 1074 East Merchant Street, Kankakee, which was the property of Dave McDaniel, by means of fire. Defendant was further charged with concealment of a homicidal death in that he, with knowledge that O.W. had died by homicidal means, concealed her death by placing her body in a structure at 1074 East Merchant Street, Kankakee, and destroyed that structure by fire. Defendant was indicted on these charges on April 11, 2002. Defendant elected to proceed to jury trial, and the jury was empaneled and the trial began on February 24, 2005.

The first witness called by the State at trial was the victim's mother, Regina Collins. Collins testified as follows. O.W., who was 12 years old on March 27, 1995, lived with her at 156 South Wildwood in Kankakee. Also living in the house at that time were Collins's boyfriend Pierre Saxon (the uncle of defendant), Pierre Saxon's mother Elsi Saxon (who shared a room with O.W.), Collins's son and O.W.'s brother John; Collins's goddaughters Contessa Kilpatrick and Catrina Haut; Collins's brother, Webster Collins; and Catrina's mother, Bobbie Jackson. On the night of O.W.'s disappearance, March 27, 1995, O.W. went to bed at around 9 p.m., as it was a school night. Around 11:30 pm to midnight a fight broke out between Contessa Kilpatrick and her boyfriend Dwight Phagan. After telling them to keep it down, Collins went to check on O.W., who was sleeping in her bed, and went back to sleep. The next morning, March 28, 1995, Collins told John Williams to go wake his sister. John reported back to Collins that O.W. was not in her bed, and after checking the rest of the house and with the neighbors, Collins called the police. Collins noted that defendant was at her house almost every day and had been there around the time of the fight between

2

Contessa Kilpatrick and Dwight Phagan, but she thought he had left.

Next to take the stand was Contessa Kilpatrick, who testified as follows. She was staying at Regina Collins's home in March 1995 and cooked dinner for O.W. and the rest of the children on the night of March 27, 1995. The dinner consisted of fried chicken, macaroni and cheese, and corn and was consumed between 5 and 6 p.m. that evening. Later that evening her boyfriend, Dwight Phagan, came home from work and the two began arguing. They were arguing in the upstairs hallway when Collins came out of her room and told them to be quiet. During this argument, when Dwight was in the bathroom, O.W. came out of her room and asked who was in the bathroom. Contessa told her "that bitch" was in the bathroom, referring to Dwight, prompting O.W. to laugh. This was the last time Contessa saw O.W. alive. Contessa testified that defendant was present in the house that night.

Pierre Saxon took the stand following Contessa Kilpatrick. He testified as follows. Defendant, his nephew, was in the house at 156 South Wildwood often. After going to bed on the evening of March 27, 1995, he was awakened by the fight between Contessa and Dwight around midnight. After telling them to take the fight outside so as not to wake the children, he checked on O.W. and his mother Elsi. That was the last time he saw O.W. alive. Pierre Saxon also testified that the next morning there were, to his knowledge, no signs of a break-in.

Next to take the stand was John, O.W.'s brother. John, 24 at the time of trial, had a brain aneurysm in 2002, but could still remember events before and after the aneurysm, but not during. He testified that he shared a room with defendant at the house at 156 South Wildwood when defendant would stay there. Defendant would, when Regina Collins was not around, play wrestle with O.W. and drag her into Regina Collins's room and lock the door. O.W. was between 11 and

3

12 years old at this time. On cross-examination, John admitted that he did not initially tell police about defendant and O.W.'s play wrestling, but denied that he waited until February 2005 to inform the police about the wrestling.

After John's testimony a stipulation was read from David McDaniels, stating that he was the owner of the garage and that he had not given defendant or anyone consent or permission to burn down the garage.

The State then called Daniel Arseneau, a lieutenant with the Kankakee fire department in March 1995. He testified as follows. On March 30, 1995, he responded to a fire at a garage at 1074 East Merchant, which he described as being "fully involved," meaning that it was out of control. Upon sifting through the ashes of the burned-out structure, Arseneau came upon what he thought was a mannequin. The mannequin turned out to be a human body and he subsequently called the police and fire investigation. Arseneau then moved the body about eight feet from where it was originally located because that area was still smoldering and he wanted to avoid any further damage to the body. The scene was then secured for fire investigation and police to arrive.

Next to the stand was arson investigator Mitchell Kushner. He testified as follows. Kushner arrived on the scene of the garage fire on March 30, 1995, accompanied by a dog trained to be alerted at the presence of accelerants. The dog indicated the presence of accelerants at three locations in the garage. While collecting evidence from an area where the dog indicated the presence of accelerants, Kushner smelled an odor of gasoline. On cross-examination, Kushner admitted that he did not know who put the gas there or how long it had been there.

The State then called Officer Jeffrey Powell of the Kankakee police department to the stand. Powell arrived on the scene of the garage fire at around 3:30 a.m. on the morning of March 30, 1995.

He smelled gas within the foundations of the garage and saw the remains of the charred female body. Powell did not remember seeing any clothing on the body, but did find a shirt and a pair of "female underwear" a few feet away from the body (albeit after the body had been moved). Powell spoke with defendant on April 25, 1995, about O.W.'s disappearance and death. Defendant told Powell that he last saw O.W. between 8 and 9 pm on March 27, 1995. Defendant told Powell of the fighting at Regina Collins's house between Contessa and Dwight. Defendant said he left the house between 11:40 p.m. and midnight after Regina Collins and Pierre Saxon had gone to bed. Defendant's home was about four or five blocks from O.W.'s home. Defendant told Powell that he did not see O.W. at all during Contessa and Dwight's fight. Powell was taking blood from everyone in the house that night to eliminate them as suspects. Defendant told Powell that he would be willing to give him a blood sample and that he would come in the next day to provide the blood. Defendant did not come to the station on April 26, 1995. The police met with defendant twice more after April 25, 1995, and although he was asked to come in and provide a sample, defendant never did, always citing an excuse. Officers made further attempts to contact defendant through phone calls and family members, but defendant never returned the calls, never contacted the police, and never provided his blood sample before 2000.

The next State witness was forensic scientist Dr. Joseph Sapala. He testified as follows. Sapala performed the autopsy of O.W. He had to use a dentist to identify the body as that of O.W. O.W.'s cause of death was hemorrhagic shock due to two stab wounds to the left chest, one of which went straight to the heart. Sapala determined that based on the color of the blood, O.W. was dead before the fire. She had been killed by the stab wounds. During the autopsy, there was a strong odor of gasoline coming from the body. Sapala found semi-digested beans and corn in O.W.'s stomach.

5

To check for signs of sexual assault, Sapala used a "Vitullo kit," also commonly known as a rape kit, and took swabs of O.W.'s vagina, cervix, anus, and mouth to get biological samples for further testing. He then turned the kit over to Officer Kilman of the Kankakee police.

Next to testify was Kankakee police detective Larry Osenga. Osenga interviewed defendant in September 1995, around five months after Officer Powell's April 1995 interview of defendant. Defendant told Osenga that he was at O.W.'s house on March 27, 1995, at around 10 or 11 p.m. or midnight and that there was lots of partying going on at the house. Defendant told Osenga that O.W. was developing quickly at an early age and that her mother, Regina Collins, was not doing a good job of taking care of and watching over the children. Defendant told Osenga that he went to a gas station around 8 or 9 p.m. to get a soda and that he stopped by O.W.'s house at around 11 p.m. or midnight that night and remembered Dwight Phagan and Contessa Kilpatrick fighting. Defendant helped look for O.W. on March 28, 1995, when it was discovered she was missing. Osenga interviewed defendant again on September 2, 1997, to convince him to provide a blood sample in connection with the investigation of O.W.'s murder. A blood draw of defendant was arranged for September 4, 1997, but defendant never called and never came in to provide a sample.

Following Osenga's testimony, a stipulation was read regarding the testimony of chain of custody of the DNA collected by Dr. Sapala from O.W. A stipulation by Melissa Staples, a qualified DNA examiner, said that based on the DNA evidence, Pierre Saxon, Dwight Phagan, and several others were excluded as sources of the DNA obtained from the sperm fraction of the rectal swab of O.W. Staples also concluded that if the sperm fraction of the rectal swab originated from only one source, Sanford Saxon Sr. was to be excluded as a source of the DNA.

Next to testify for the State was Daniel Gondor, a forensic scientist with the Illinois State

6

Police. He testified has follows. He performed only a limited DNA profile of the sperm found in O.W.'s rectum, in that he only tested at 9 locations, or "loci," instead of the usual 13, but that the 9 locations he tested at indicated this specific DNA profile would be found in only 1 in 24 trillion African-Americans. In his professional opinion, after comparing the two DNA profiles, the DNA removed from O.W.'s rectum came from defendant. Also, depending on the habits of the individual, it would be less likely to obtain a DNA profile from sperm recovered from an individual's rectum more than 72 hours after sexual intercourse.

Jay Etzel, a detective-sergeant for the Kankakee police department was next called to the stand. He testified as follows. In February 2000 he obtained a search warrant for defendant's DNA. He later received word that after the lab analysis, defendant's DNA matched the DNA recovered from the rectum of O.W. On February 16, 2001, Etzel interviewed defendant. At the beginning of the interview, defendant appeared very nervous and was pacing. Defendant told Etzel that he had no idea who killed O.W. and that he told the detectives everything he knew about the case back in 1995. Etzel read defendant his Miranda rights. When confronted with the DNA evidence, defendant continued to deny any involvement with O.W., saying it could not be his and that he never touched her. Defendant denied being in O.W.'s house on March 27, 1995. Etzel then showed defendant Contessa Kilpatrick's statement claiming that defendant was in the house that night. Defendant then admitted to being present in O.W.'s house, saying he was there at 10 p.m. for about 20 seconds. He then said he saw Contessa and Dwight's fight and also saw O.W. Etzel noted that defendant would initially not respond to questions about having sex with O.W., but then said he did have sex with O.W., but that it only happened once. Defendant claimed he had sex with O.W. only once and that it was two days prior to her disappearance and was at her house in her brother John's bedroom (the

7

same bedroom that defendant shared with John whenever he stayed over at the house). Defendant stated he knew O.W. had not told anyone they had had sex.

Defendant then told Etzel that O.W. was having sex with lots of boys and that he had once walked in on O.W. having sex with various boys and he chased them off, but never told O.W.'s mother or anyone else about her behavior. Defendant also told Etzel that he had seen O.W. run upstairs from her basement followed by Marvin Landfair, who was pulling his pants up, but that he never told anyone about what he observed. Defendant said he loved O.W. and that he was the only one she could trust. Defendant then told Etzel that he knew who killed O.W. and that it was Marvin Landfair, whom he had seen four days after O.W.'s disappearance with blood on his jacket. Defendant then refused to give Etzel a written statement of everything he had just told him.

Next to testify was Jennifer Schnell, the nurse who drew defendant's blood in 2000. She noted that defendant was apprehensive about the blood draw, but cooperated after being shown the search warrant authorizing the drawing of his blood.

Next to testify was Catrina Haut, Regina Collins's goddaughter who lived in the house at 156 South Wildwood. She testified as follows. She lived with her children in a room across from O.W.'s room in March 1995. O.W. never told her she was sexually active. Further, O.W. was not the type to go out on her own. She had also seen defendant "wrestle around" with O.W., as if play wrestling like a brother and sister.

Next to testify was Alean Ward, defendant's aunt, whom defendant lived with in March 1995 at 241 East Locust in Kankakee. She had previously lived at 1074 East Merchant Street for about two years and recalled defendant visiting her there often. She recalled hearing on either March 30 or March 31, 1995, that the garage at 1074 East Merchant Street, her old house, was on fire and that

8

there was a body found inside. Defendant then told her that the body was probably that of O.W. because she was missing. When she told him it could be anybody, defendant, who was "kind of upset," still said he thought it was O.W.

Last called to the stand was Ann Valerio, who lived at 1074 East Merchant in March 1995. She never gave anyone permission to use the garage behind her house, and on cross-examination, she testified that she did not use the garage and did not park any of her cars in the garage.

After Ann Valerio's testimony the State rested. The trial court then entertained and denied a defense motion for a directed verdict. After defendant exercised his constitutional right not to testify in his own defense, the defense rested. On March 1, 2006, after hearing closing arguments and receiving instructions from the trial court, the jury retired to the jury room to deliberate. Later that day the jury returned with a verdict of guilty on all counts. The jury also found beyond a reasonable doubt that the murder was accompanied by brutal and heinous conduct indicative of wanton cruelty. The matter proceeded to sentencing on April 26, 2005, where defendant was sentenced to concurrent terms of natural life imprisonment for first degree murder, seven years for arson, and five years for concealment of a homicidal death. Defendant immediately filed notice of appeal.

ANALYSIS

On appeal, defendant contends that the evidence presented at trial by the State was insufficient to sustain a finding of guilt beyond a reasonable doubt. There is no issue in this case as to whether the victim was murdered and her body burned. The only issue in this case is whether defendant was the person who committed the crimes charged. Defendant asks this court to reverse his convictions of first degree murder, arson, and concealment of a homicidal death. We find the

9

evidence presented at trial was sufficient for the jury to find defendant guilty and therefore affirm the finding of guilt on all charges. Given the circumstances, we find that a rational trier of fact could find defendant guilty beyond a reasonable doubt.

When faced with a challenge to the sufficiency of the evidence, the reviewing court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. People v. Collins, 106 Ill.2d 237, 261, 478 N.E.2d 267, 277 (1985). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." People v. Bush, 214 Ill.2d 318, 326, 827 N.E.2d 455, 460 (2005). This standard of review applies in cases whether the evidence is direct or circumstantial. People v. Pintos, 133 Ill.2d 286, 291, 549 N.E.2d 344, 346 (1989). The reviewing court will not retry the defendant. People v. Milka, 211 Ill.2d 150, 178, 810 N.E.2d 33, 49 (2004); People v. Hall, 194 Ill.2d 305, 329-30, 743 N.E.2d 521, 536 (2000); People v. Jimerson, 127 Ill.2d 12, 43, 535 N.E.2d 889, 903 (1989). "[D]eterminations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact." Jimerson, 127 Ill.2d at 43, 535 N.E.2d at 903. A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt as to defendant's guilt. People v. Ehlert, 211 Ill.2d 192, 202, 811 N.E.2d 620, 625 (2004); People v. Flowers, 306 Ill.App.3d 259, 266, 714 N.E.2d 577, 582 (1999).

"Where evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution." People v. McDonald, 168 Ill.2d 420, 447, 660 N.E.2d 832, 843 (1995). "When weighing the evidence, the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible

10

explanations consistent with innocence and raise them to a level of reasonable doubt." McDonald, 168 Ill.2d at 447, 660 N.E.2d at 843. "An inference is a factual conclusion that can rationally be drawn by considering other facts. Thus, an inference is merely a deduction that the fact finder may draw in its discretion, but is not required to draw as a matter of law." People v. Funches, 212 Ill.2d 334, 340, 818 N.E.2d 342, 346 (2004). The trier of fact heard the evidence and "was not obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." People v. Sutherland, 223 Ill.2d 187, 233, 860 N.E.2d 178 (2006).

"'A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it.'" People v. Patterson, 217 Ill.2d 407, 435, 841 N.E.2d 889, 905 (2005), quoting People v. Williams, 40 Ill.2d 522, 526, 240 N.E.2d 645 (1968). Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant. A defendant can be convicted solely on circumstantial evidence. The trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence. Milka, 211 Ill.2d at 178, 810 N.E.2d at 49. "It is sufficient if all the evidence taken as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." People v. Edwards, 218 Ill.App.3d 184, 196, 577 N.E.2d 1250, 1258 (1991).

False exculpatory statements are "'probative of a defendant's consciousness of guilt.'" Milka, 211 Ill.2d at 181, 810 N.E.2d at 51, quoting People v. Shaw, 278 Ill.App.3d 939, 951, 664 N.E.2d 97, 105 (1996). "The commission of a crime leaves usually upon the consciousness a moral impression that is characteristic. The innocent man is without it; the guilty man usually has it. Its

evidential value has never been doubted.  The inference from consciousness of guilt to 'guilty' is always available in evidence."   1A J. Wigmore, Evidence §173, at 1840 (Tillers rev. 1983). Although "a false exculpatory statement is not conclusive evidence of the defendant's consciousness of guilt (People v. Puente, 98 Ill.App.3d 936, 424 N.E.2d 775), a pre-arrest exculpatory statement is admissible in the State's case-in-chief as probative evidence of the defendant's consciousness of guilt."  People v. Buss, 112 Ill.App.3d 311, 319, 445 N.E.2d 894, 900 (1983).

On appeal, defendant challenges aspects of the State's case, alleging that the State's evidence was weak and so unreasonable, unsatisfactory, or improbable as to leave a reasonable doubt of his guilt.  Defendant contends that the admitted sexual intercourse with the victim does not translate into proof of the offenses of murder, arson, and concealment of a homicidal death.  Defendant argues that the State's theory as to motive and opportunity, that defendant killed the victim to cover up his alleged sexual act, was mere speculation.  Defendant also argues that his inconsistent statements regarding his contacts with the victim before her disappearance, his failure to volunteer a DNA sample, and his denial of even being in the intended victim's house would not establish his guilt, but merely create a "strong suspicion" of defendant's guilt.  Defendant further argues that the lack of direct physical evidence connecting him to the crime as well as other possibilities serve to negate findings of guilt.  Defendant argues that his mere presence at the victim's house on the evening of her disappearance and his familiarity with the residence are not sufficient to establish guilt.  Thus, defendant argues that the case against him leaves a reasonable doubt of his guilt. We disagree.  All of the above evidence was presented to the jury and defendant's arguments were rejected.  Given all the circumstances, we cannot conclude that findings of guilt were so unreasonable that they must be rejected on appeal.  The fact finder need not accept defendant's version of events and we should not

retry defendant. See Milka, 211 Ill.2d at 178, 810 N.E.2d at 49.

When viewed as a whole, and given the circumstances, the evidence presented could lead the jury to believe that defendant had performed anal intercourse on a 12-year-old girl around the time of her disappearance and in order to cover up his crime, defendant murdered her and then burned her body inside the garage fire to cover up the murder. The jury could base this decision on inferences derived from the evidence it was presented. On review, this court must allow all reasonable inferences from the record in favor of the prosecution. Bush, 214 Ill.2d at 326, 827 N.E.2d at 460. Defendant was in the victim's house that night, was familiar with the victim's house and the property where the body was found, and admitted to having sex with an underage girl around the time of her disappearance. Defendant had motive, opportunity, and access to commit the crimes of which he is accused. People v. Howery, 178 Ill.2d 1, 39, 687 N.E.2d 836, 854 (1997) (where the evidence was largely circumstantial, evidence of motive, opportunity, presence of accelerant on defendant's clothing on night of fire, and inconsistent statements made following fire were sufficient to convict defendant of arson and first degree murder). Taken together with the other pieces of circumstantial evidence, such as defendant's inconsistent statements and other conduct before and after the fire, we find that this evidence, when viewed in the light most favorable to the State, allowed a rational trier of fact to find defendant guilty beyond a reasonable doubt of the crimes charged. Defendant's convictions are affirmed.

Affirmed.

LYTTON, P. J. concurring and MCDADE dissenting.

13

No. 3--05--0292

_____

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court for the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | No. 02-CF-116 |
| v. | ) ) | |
| TODD SAXON, | ) ) | Honorable Gordon S. Lustfeldt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE, dissenting:

_____

The majority has affirmed the conviction of defendant, Todd Saxon, for first degree murder, arson, and concealment of a homicide. Because he was convicted of those crimes solely on the basis of sexual misconduct – with which he was not charged, of which he was not convicted, and which, according to forensic evidence, may have occurred three days before the murder – and because there is no evidence that he actually committed them; I respectfully dissent from that decision.

Defendant has admitted having anal sex with the victim. Because she was only twelve years old at the time, such sex was non-consensual as a matter of law. Defendant confessed to the sexual misconduct. This confession should never have been before the jury because it was irrelevant to the crimes actually charged. Although the State had a "confession," defendant was never charged with

1

sexual assault (assertedly because the statute of limitations had run) and his guilt beyond a reasonable doubt was never proven in court. This fact did not stop the State from using that crime as the sole fount of all inferences "proving" the crimes charged.

The victim, O.W., was stabbed to death, and her partially charred body was found in a burned-out garage. Defendant was charged with her murder and with a possible arson that has been characterized as an attempt to conceal the homicide. There is exactly *zero* direct evidence tying defendant to any of the charged crimes.

Looking first at the murder, the police found no weapon, no fingerprints, no DNA evidence, no blood-stained clothing, no witness who saw the victim and defendant together that night, no witness who put defendant at or near the garage at relevant times, and no testimony from O.W.'s grandmother (with whom she shared the bedroom) about when or with whom O.W. may have gone out. In short, there was no direct evidence that this defendant had anything to do with O.W.'s murder.

What about the arson/concealment of a homicide? There was *no* accelerant container, and, necessarily, no fingerprints on such a container, no witness who placed defendant at or near the garage at any relevant time, no clothing with accelerant stains, no clothing reeking of smoke or with signs of burning, nothing to suggest that defendant had been in the garage with the victim at the relevant time or, indeed, at any time. The concealment charge is yet another inference – this one from the apparent arson.

The State argues and the majority apparently agrees that this complete lack of evidence is offset by the State's argument that defendant's sexual assault of O.W. yields sufficient inferences to support his convictions for murder, arson, and concealment of a homicide.

2

Certainly, reasonable inferences are tools that have long been used to supplement *weak* evidence in criminal cases. Here, however, the majority -- as did the State and the trial court -- finds that it is reasonable to draw inferences from *no* evidence relating to the crimes charged.

But that is not the law in Illinois nor apparently in the federal courts. In *People v. Davis,* 278 Ill. App. 3d 532, 663 N.E.2d 39 (1996), the court stated:

> "A reasonable inference within the purview of the law must have a chain of factual evidentiary antecedents. If an alleged inference does not have a chain of factual evidentiary antecedents, then within the purview of the law it is not a reasonable inference but is instead mere speculation." *Davis*, 278 Ill. App. 3d at 540, 663 N.E.2d at 44.

See also *United States v. Jones,* 371 F.3d 363, 366 (7th Cir. 2004) ("although a jury may infer facts from other facts derived by inference, 'each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation.'" *United States v. Peters,* 277 F.3d 963, 967 (7th Cir. 2002) (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001))). Accord *United States v. Cruz*, 285 F.3d 692, 699 (8th Cir. 2002); *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000); *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994).

The facts on which the State relied in the instant case are fully recounted by the majority. As can initially be seen, the State was allowed to present evidence to, in essence, "try" defendant for the sexual assault of O.W. – despite the facts that he was not charged with that crime and that his prosecution for it was admittedly barred by the statute of limitations. His tacit "conviction" of that crime then served as the sole "factual" predicate for his actual conviction of the charged crimes. As to those convictions: although the State presented evidence that O.W. was murdered and that the

3

garage burned as a result of arson, it presented no evidence that tied defendant to either of those crimes.

The defense presented a motion for directed verdict at the close of the State's evidence and it was, in my opinion, gross error for the trial court to deny it. As the *Davis* court concluded:

"It follows that without a single factual evidentiary antecedent to support it, the State's alleged inference that Davis had the opportunity to commit the homicide cannot bear water. It also follows that the State's alleged derivative inference that Davis was the one who used the gun at the time of the homicide is not a reasonable inference within the purview of the law, but is instead mere speculation. A person's liberty is an endowment that is too valuable to be lost on speculation of wrongdoing. Our system of government demands more proof! Moreover, the proof must be beyond a reasonable doubt. It does not exist in this case. (Citation)." *Davis*, 278 Ill. App. 3d at 541, 663 N.E.2d at 45.

Nor does it exist in the instant case. The State has clearly established that O.W. was a victim of murder followed by arson; has plainly shown that defendant sexually assaulted her; has made weak and ineffectual stabs at showing that defendant had motive[1] and opportunity to commit the crimes;

---

[1]The State complains in its brief about the trial court's exclusion of evidence that defendant had committed eight other sex offenses against children, one of which "involved defendant taking the victim to a garage," presumably for sex. There is no assertion that defendant murdered and burned any of those other victims (or that he attempted to do so). Moreover, the testimony of O.W.'s brother suggests that there had been prior sexual conduct between O.W. and defendant, but clearly he had not previously killed and burned her (or attempted to do so). It appears to me that the *reasonable* inferences to be drawn here militate *against* any notion that this

4

but has presented no evidence and no reasonable inferences to show that he, in fact, did commit them.

If defendant's fingerprints had been found on an accelerant container or if a knife with even trace evidence of blood of O.W.'s type had been found in a place where he lived or frequented or if defendant had been the only outsider at the house that night rather than one of numerous others, I might still be uncomfortable about the correctness of the conviction but would most likely be writing a special concurrence rather than this dissent. But with no actual, forensic or tenable circumstantial evidence, I simply cannot see how a jury could fairly or validly conclude that defendant was guilty of murder, arson, and concealment of a homicide beyond any reasonable doubt.

But the majority has another prong to its decision to affirm. Citing John Henry Wigmore (1863-1943), it sets up the premise that:

> "The commission of a crime leaves usually upon the consciousness a moral impression that is characteristic. The innocent man is without it; the guilty man usually has it. Its evidential value has never been doubted. The inference from consciousness of guilt to 'guilty' is always available in evidence." 1A Wigmore, Evidence §173, at 1840 (Tillers rev. 1983).

Despite its undeniable whiff of mysticism, divination, and the occult, courts have long accepted the concept of consciousness of guilt as probative of guilt. Fortunately, some courts, including our supreme court, have required that there at least be some concrete manifestation of this consciousness. One of those accepted manifestations is false exculpatory statements made by the defendant. *People*

---

defendant feels a need to kill the victims of his sexual perversions.

5

*v. Milka*, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004).

Viewed in the abstract, "consciousness of guilt" is itself a circular and therefore flawed logical construct. Its application requires the fact finder to assume the ultimate fact – that the defendant committed the murder – in order to conclude that a particular act or statement of the defendant was motivated by his knowledge that he had committed the murder and is, therefore, evidence of his guilt. The concept presumes guilt to prove guilt and also impermissibly shifts the burden to the defendant to disprove that it was his/her awareness of guilt that caused the doing of the act or the making of the statement. It has no place in a system of law that presumes the innocence of the defendant until actual conviction by the finder of fact. Beyond pointing out this weakness, I will forgo indulging in any discussion of significant but more amorphous concerns such as how someone who is not a close friend or associate of defendant could actually know or correctly interpret the meaning and messages of his or her body language and evasions.

What does require discussion in the instant case is that we know that this defendant engaged in sexual misconduct; we know he lied about it; and we know that he tried diligently for over two years to avoid being charged with it. How could the police or the prosecutors or the jurors (who could not observe it but only heard about it from others) possibly know that his denials of the sexual assault constituted a consciousness of guilt – if indeed he felt and/or communicated such an emotion or awareness – that was totally related to the sexual misconduct and totally unrelated to the child's death?

More importantly, how can we as an objective reviewing court find that this "consciousness of guilt" coupled with guilt of sexual assault, but also with a complete absence of any direct, forensic, or tenable circumstantial evidence proving any element (let alone all of them) of the charged crimes

6

somehow creates an inference strong enough, inevitable enough, compelling enough, to say that it supports defendant's conviction for first degree murder, arson, and concealment of a homicide *beyond a reasonable doubt*?

I am well aware that the public and the media frequently say that a case was reversed "on a technicality."  And I can well imagine the ridicule -- even in our courts – that attends discussions of logical constructs, flawed logic and circular arguments.   But the technicalities are constitutional guarantees, supreme court rules and legislative directives designed to ensure, as much as possible, that the person who is convicted of a crime is, in fact, the person who committed it.  And the mental evaluations are necessary to tease out flaws in the bases on which we deprive people of their liberty and their lives.  These are not intellectual exercises undertaken in a vacuum.  There are *people* attached to them.

According to the Innocence Project of the Benjamin N. Cardozo School of Law, as of July 12, 2007, there have been 203 post-conviction exonerations since the availability of DNA testing in 1989.  That means that there are at least 203 innocent people who were convicted, whose convictions were affirmed at least once on review, and who were incarcerated for periods of time ranging from 1 year to *26 years*, with the average sentence being 12 years.[2]  Fifteen of those found innocent were on death row.  Of the persons exonerated, approximately 70% are members of minority groups, with the vast majority of those being African-Americans.

Despite these horrific statistics, the people involved are actually "lucky."  There was physical evidence in their cases which could be tested for DNA.  We have, of course, no way of knowing how

---

[2]Twenty-seven of those exonerated are from Illinois.  Of those, 5 served between 20 and 26 years; 19 served between 10 and 19 years; and 3 served between 6 and 9 years. None served less.

7

many other residents of the nation's prisons have been falsely convicted and, perhaps, executed.

The Innocence Project has also attempted to document the causes of wrongful convictions and has concluded they result from systemic defects that are a catalog of "tried and true" forms of what we consider to be the "best" evidence.  Over 75% are attributable to erroneous eyewitness identification.[3]  Of particular concern in the present case, more than 1/3 of the wrongful convictions were linked to the misapplication of forensic disciplines – which the Project defines as where "forensic scientists and prosecutors presented fraudulent, exaggerated, or otherwise tainted evidence to the judge or jury which led to the wrongful conviction."[4]  www.innocenceproject.org.

The instant case is, in my opinion, a prime example of the manipulation and exaggeration of data to cover up the complete lack of any competent evidence that the defendant actually committed the crimes with which he was charged.

I do not believe that the nation's appellate and supreme courts can shrug off our responsibility for wrongful convictions.  It is easy to say that the police did not do an adequate investigation, that the trial attorneys conducted themselves improperly or performed inadequately, or that the trial judges glossed over something required of them by rule, statute or case law.  But the bottom line is that we -- the reviewing courts -- are the ones who exculpate those short-comings.  We decry prosecutorial argument that is violative of the rules but persist in finding it to be "harmless."  When we turn ourselves in knots and defy logic to affirm convictions rather than requiring that the process be done

---

[3]I personally know of several cases where the procedures for securing these identifications were so flawed that the convictions should never have been affirmed.

[4]Other principal factors identified as leading to wrongful convictions are false confessions; the use of jailhouse informants, especially in exchange for deals, special treatment, or the dropping of charges; and bad lawyering, including failure to investigate, failure to call witnesses, and the inability to prepare for trial (due to caseload or incompetence).

correctly, we are not doing our jobs. To put it bluntly, we have met the enemy of justice and it is us.

This defendant is not a nice man. He molests little girls and he needs to be punished for that. But we pervert the system and rule of law that is the foundation of our principles of justice when we validate his conviction for crimes he has not been proven to have committed. Beyond that we set a precedent that can be used to support further erosions and reduce the protection against wrongful conviction that our nation and our system promise to the innocent. Of equal importance in a system that substitutes the rule of law for personal retribution, if the convicted defendants did not commit the crimes, the victims have not gotten justice because their violators go unpunished.

For all of the foregoing reasons, I cannot concur with the majority's decision. I agree that the jury apparently concluded that the State's smorgasbord of non-evidence was sufficient to find defendant, Todd Saxon, guilty, beyond a reasonable doubt, of murder, arson, and concealment of a homicide. I dissent from the majority's finding that *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 2177 (1985), requires us to hold that the jury's conclusion was supported by the evidence presented by the State, was based on evidence that was sufficient to prove any of the elements of the crimes charged, even when viewed in the light most favorable to the prosecution, or that the conviction is reasonable or sustainable on appeal. If *Collins* does so require, then I, with the utmost respect, would suggest to the supreme court that the decision has created a standard for validating rather than revealing erroneous judgments and it should be revisited and clarified.

9