NOTICE

Decision filed 03/02/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220108

NO. 5-22-0108

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-856 |
| | ) | |
| TERRENCE L. PERKINS, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Terrence L. Perkins, appeals his convictions and sentences following a bench trial in the circuit court of Champaign County on two counts of the offense of threatening a public official. 720 ILCS 5/12-9(a-5) (West 2020). For the following reasons, we affirm the trial judge's finding that the elements of the charged offenses were proved beyond a reasonable doubt at the defendant's bench trial.

¶ 2                                    I. BACKGROUND

¶ 3    The facts necessary to our disposition of this appeal are as follows. On July 22, 2021, the defendant was charged, by information, with, *inter alia*, one count of the Class 3 felony of threatening a public official. The information alleged that on July 21, 2021, the defendant

1

"knowingly conveyed, directly or indirectly, to Officer Orval Stuckemeyer, a public official, a communication that contained a threat that placed Orval Stuckemeyer, the public official, in reasonable apprehension of immediate or future bodily harm and the threat was conveyed because of Orval Stuckemeyer's performance of his public duty, in that the defendant threatened to come to the police department the next day with other individuals and harm Orval Stuckemeyer."

¶ 4 On October 7, 2021, a second count of threatening a public official was charged by information. The information alleged that on July 21, 2021, the defendant

"knowingly conveyed, directly or indirectly, to Officer Orval Stuckemeyer a public official, a communication that contained a threat that placed Orval Stuckemeyer, the public official, in reasonable apprehension that damage would occur to property in the custody, care, or control of Orval Stuckemeyer, the public official, and the threat was conveyed because of Orval Stuckemeyer's performance of his public duty, in that the defendant threatened to break the window of Orval Stuckemeyer's squad vehicle, namely by kicking said window."

¶ 5 The case proceeded to a bench trial on December 1, 2021. At the outset of the bench trial, counsel for the defendant moved for a continuance to allow him time to do additional research on issues raised in a memorandum of law filed by the State the previous day. The State objected, contending that the law cited in its memorandum was "not new" and had "been around." The State thereafter moved to dismiss two other charges against the defendant, leaving only the two counts described above. Ultimately, the defendant's motion to continue was denied, and the two counts of threatening a public official proceeded to trial.

¶ 6 As its only witness, the State called Orval W. Stuckemeyer, who testified that he was a patrol sergeant with the Rantoul Police Department and that he had been employed by the

department for approximately 16 years. He testified that on July 21, 2021, while on duty, he responded to a dispatch to an apartment complex about a possible domestic battery. He testified that the defendant was identified as the suspect in the case. He identified the defendant in court. Stuckemeyer testified that he made contact with the defendant at a nearby food and drink establishment and that, at the time of the contact, he believed that he had probable cause to arrest the defendant for domestic battery.

¶ 7 Stuckemeyer testified that he was wearing a body camera that day, testified as to how it worked and that it was working properly that day, and authenticated People's exhibit 1, which he testified was a DVD recording taken from his body camera. He testified that the recording consisted of "fair and accurate representations of" his interactions with the defendant that day. The exhibit was admitted into evidence and published to the trial judge. Thereafter, the trial judge stated for the record that the recording he had watched "was roughly 40 to 42 minutes long."

¶ 8 Counsel for the State then continued with his questioning of Stuckemeyer. With regard to Stuckemeyer's interpretation of the defendant's statement, which was made several times, that the defendant "was going to surprise [Stuckemeyer's] ass," Stuckemeyer testified as follows:

"Given my impressions of his demeanor and other statements that he had made along the way, my interpretation of that was that he intended to possibly lie in wait or set an ambush for myself or other officers to do physical harm to us."

Counsel for the State also noted that the defendant at one point stated that the defendant "was finna drop one of you motherfuckers," and asked Stuckemeyer what he believed the defendant meant by that. Stuckemeyer testified as follows:

"So, through my training and experience, 16 years in the Rantoul Police Department, drop one of you, or *** to use his language, drop one of you motherfuckers, typically means to—in street slang, it typically means to shoot somebody and kill them."

3

¶ 9    Counsel next asked about the defendant's statement that the defendant was going to "sit around and wait for [Stuckemeyer's] ass." Stuckemeyer testified "that was another indication to me that he intended to lie in wait or set an ambush for myself." Counsel asked about the defendant's statement "that he was gonna come looking for you tomorrow after he got out of jail," that the defendant would find out Stuckemeyer's name, and that although Stuckemeyer was not talking to the defendant now, he would talk to him later. Stuckemeyer testified that this too led him to believe that the defendant "intended to use some kind of physical force to either coerce or force [Stuckemeyer] to answer [the defendant's] questions." When asked by counsel about the defendant's statement "that he was coming to the police station tomorrow with, I'll quote, '50 motherfuckers' " to " 'fry' " Stuckemeyer's " 'ass,' " Stuckemeyer testified that he interpreted the defendant's statement to mean "[t]hat he intended to assemble what I would consider to be a mob or a large group of like-minded individuals and commence an attack, either on the police department or myself, again, through physical violence."

¶ 10    Counsel noted that the defendant had also stated that he wanted to punch Stuckemeyer in the face, and asked Stuckemeyer if the defendant's statement impacted the transportation of the defendant to the police station. Stuckemeyer testified as follows:

> "Yes, because he—he described a specific act of physical violence. He stated that his wrists were hurting. He referred to his wrists as 'my shit,' but I interpreted that to mean that his wrists were hurting because he was talking about the handcuffs. And he stated that he wanted to punch me in my face so my face essentially felt like his wrists felt."

¶ 11    Stuckemeyer testified that "based on the totality of the statements that the defendant made during his transport," Stuckemeyer believed that the defendant intended, after the defendant was released from jail, "to formulate a plan in order to exact some form of revenge through physical violence, either upon myself or other officers." He testified that he "had no doubt that he would

4

carry out his plan to—to visit physical violence on myself or other officers." When asked if, based upon his observation of the defendant's "build, his height, his weight," he believed that the defendant was capable of harming him, Stuckemeyer testified, "Yes."

¶ 12  With regard to the defendant's statements about kicking out the windows of the squad car, Stuckemeyer testified that the vehicle was owned by the City of Rantoul, that he was responsible for it on that date, and that it was in his exclusive care and control at that time. He testified that the "several audible thumps" heard in parts of People's exhibit 1 were the sound of the defendant "kicking some interior part of the squad car" after having "threatened to kick the windows out of the squad car." When asked if, based upon the defendant's "build, height, weight," he believed the defendant was capable of damaging the car, Stuckemeyer testified, "Yes. In fact, we've had other vehicles damaged by arrestees who have attempted to force their way out of the car in the past." He testified that he believed the defendant was capable of kicking the window out, which the defendant stated "several times" that he intended to do. He agreed that at one point, the defendant threatened to do it in three seconds and began to count to three. He testified that he believed that the defendant would attempt to break out the window. He testified that the defendant's legs were not restrained at the time the defendant was making these statements.

¶ 13  On cross-examination, Stuckemeyer agreed that during the transport of the defendant, the defendant was sitting upright in the back seat of the squad car and that he did not see the defendant "go to his side or anything" during the entire trip. He testified, however, that he had observed people who were able to kick the window glass "without actually leaning to the side." He testified that these were "[s]mall or midsize" people and that it depended upon "the individual's flexibility." He agreed that the defendant was "a very large man" but testified that he believed that whether the defendant could have kicked out the glass window would depend upon the defendant's flexibility. He agreed that he did not mention in his police report that the defendant threatened to kick out the

5

window on the count of three and began to count to three. He agreed that police officers receive threats from people "all the time," that he did not believe the defendant knew his name on that night, and that the defendant did not tell him that the defendant knew where he lived. He further agreed that he knew that the defendant would not be released that night and would have to see a judge in the morning to have his bail set first, and that therefore the defendant could not carry out any threats that night. When asked if the defendant was angry, Stuckemeyer testified as follows:

"I would describe his demeanor as anger escalating to the point of rage. And from time to time, while he's screaming and yelling at me, I can feel the squad car moving around ***. *** I also felt the squad car move when he was—when, presumably, he's kicking some interior portion of the squad car. I could hear the thumps. And immediately in conjunction with the thump, I could feel the squad car shift."

¶ 14   Stuckemeyer agreed that although the defendant counted to two after threatening to kick the window out on three, the defendant never got to three, because the defendant instead began talking about something else. However, he testified that he believed that the defendant "had worked himself up to the point where he was going to break the window out." He testified that he "was trying to mitigate the situation" by rolling down the window a bit for the defendant at the defendant's request. He reiterated that it was the defendant's demeanor and manner, as well as his words, that caused Stuckemeyer to take the defendant's statements as threats.

¶ 15   On redirect examination, Stuckemeyer testified that he believed it was possible that the defendant could kick out the back seat window. He agreed that, in his police report, he stated that the defendant threatened to kick the window out, even though he did not put anything in the report about the defendant counting to three. He agreed that on the night in question, he was wearing a police uniform with his full last name in capital letters on a name strip and that the defendant could have figured out his name that night.

¶ 16    Following Stuckemeyer's testimony, the State rested. The defendant moved for a directed verdict, which was denied. The defense rested without presenting any evidence, then made a renewed motion for a directed verdict, which again was denied. The parties presented their closing arguments, and the trial judge stated that he would take the matter under advisement.

¶ 17    On December 9, 2021, the parties again appeared, and the trial judge rendered his verdict in open court. He stated that the evidence in the case consisted of Officer Stuckemeyer's testimony, and the body camera footage, and that there existed, in essence, "no dispute as to the facts." He added that "[t]he real issue" in this case was whether the defendant was making "true threats," which he noted, under recent Illinois precedent, did not mean that "the defendant had to carry out the threat or intend to carry out the threat," but only that the defendant understood "the threatening nature of his communication and the import of his words," or was, in other words, "subjectively aware of the threatening nature of the speech." He stated that looking at the totality of the circumstances in this case, he believed that although some of the defendant's profanity and other statements were "protected under the First Amendment," nevertheless, when it came to the alleged threats, "the specific words that the defendant used, the volume, the profanity, the length of time during this drive, the court comes to the conclusion that [the] defendant's words were, in fact, true threats." He added that "the officer was in reasonable apprehension of immediate or future physical harm," that "[t]he defendant knew that his words were of a threatening nature," and that he "would have a hard time finding differently based on the evidence here."

¶ 18    With regard to the count alleging threats to damage property, the trial judge stated that in his opinion, this was "a much closer call," but he concluded that the totality of the circumstances again demonstrated that "[t]he defendant knew that this was a threat to be taken seriously because when the officer lowered the window, the defendant said he wasn't really going to do it but that his words got the officer to actually open the window. He knew his words were to be taken

7

seriously as a threat." He added that the defendant "tried to get the officer to do something and he accomplished it," which he again concluded was "a true threat." He found the defendant guilty of both counts and added that "[h]ad these been general threats, had it been maybe one or two brief statements, had it gone on for a couple of minutes," he "very well may have ruled differently, but looking at the totality of the circumstances, the court can only come to this one conclusion."

¶ 19    On December 30, 2021, the defendant filed a motion for acquittal, or in the alternative, motion for a new trial. Following a brief hearing on February 10, 2022, the motion was denied. Also on February 10, 2022, the defendant was sentenced, following a hearing, to concurrent terms of 24 months of probation for each count. He also was sentenced to two days in jail, with credit for time served, as well as various financial assessments that later were waived by the circuit court due to the defendant's inability to pay them. He was ordered to enroll in, and successfully complete, an anger management program and to obtain a substance abuse assessment. This timely appeal followed. Additional facts will be presented as necessary in the remainder of this opinion.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, the defendant contends that "[t]he statements made to police by [the defendant] contained no 'specific facts indicative of a unique threat,' so they cannot sustain his convictions for threatening a public official [because] the statute explicitly does not preclude 'general threats of harm' to sworn law enforcement officers." In support of this contention, the defendant first argues that because the facts in this case are largely undisputed, this court should employ a *de novo* standard of review. However, we agree with the State that the defendant's arguments on appeal contest the sufficiency of the evidence adduced at the defendant's bench trial and contend, in essence, that he was not proved guilty beyond a reasonable doubt of the charged offenses because that evidence was not sufficient to meet the required elements of those offenses when involving alleged threats against a police officer.

8

¶ 22    When a defendant contests the sufficiency of the evidence used to convict the defendant, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* There is no requirement that this court disregard inferences that flow from the evidence or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416. It is axiomatic that "[t]he standard for reviewing the sufficiency of the evidence in a bench trial is the same as it is in a jury trial." *People v. Howery*, 178 Ill. 2d 1, 38 (1997). We note that Illinois courts of review have consistently rejected attempts to recast the standard of review in cases such as this one, with one recent example being the 2023 decision of the Illinois Supreme Court in *People v. Jones*, 2023 IL 127810, ¶¶ 20-28. We note as well that even if we were to employ a *de novo* standard of review, as requested by the defendant, it would not change our conclusion that there was no error in this case.

¶ 23    With regard to the defendant's specific arguments on appeal, the defendant notes that the statute he was convicted of violating contains the following requirement when the charges relate to alleged threats against a police officer: "For purposes of a threat to a sworn law enforcement officer, the threat must contain specific facts indicative of a unique threat to the person, family or

property of the officer and not a generalized threat of harm." 720 ILCS 5/12-9(a-5) (West 2020). He contends that his conduct in this case consisted of, at most, statements that were "far from specific or unique" and that accordingly cannot satisfy the statute. He claims that many of his alleged threats were made "in a joking tone," or conveyed a sense of frustration with his circumstances, meaning that taken together they "were clearly intended and are reasonably perceived as spouting off in a state of anger." He posits that "[t]he totality of circumstances establishes that this was nothing more than typical lashing out by a frustrated arrestee who believed the officers were in the wrong, and were mistreating him."

¶ 24    We begin by noting that, as the trial judge recognized—and as the State suggests on appeal—the recent decision of the Illinois Supreme Court in *People v. Ashley*, 2020 IL 123989, is instructive with regard to what types of threats can subject a person to possible criminal penalties. The *Ashley* court pointed out, in its discussion of a challenge to a statute against stalking, that to avoid running afoul of free speech concerns, the criminalization of certain forms of speech must comport with the jurisprudence of the United States Supreme Court holding "that certain traditional categories of expression do not fall within the protections of the first amendment." *Id.* ¶ 31. The *Ashley* court noted that "[t]hose accepted categories of unprotected speech include true threats, which may be banned without infringing on first amendment protections." *Id.* The court continued as follows:

> "The Supreme Court has held that ' "[t]rue threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' [Citation.] 'The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear

10

engenders," in addition to protecting people "from the possibility that the threatened violence will occur" ' [Citation.]" *Id.* ¶ 33.

¶ 25 The *Ashley* court thereafter held that, based upon its interpretation of precedent, "the first amendment exception for a 'true threat' includes situations where the speaker understands the threatening nature of his or her communication and the import of the words used," which means "that the accused must be subjectively aware of the threatening nature of the speech." *Id.* ¶ 56. The court further held "that the true threat exception under the first amendment does not mandate that the accused specifically intend to threaten the victim." *Id.* ¶ 57. The court stated that it rejected the "claim that specific intent to threaten the victim is necessary for a true threat." *Id.* ¶ 58. The court further ruled that "the true threat exception is premised on the negative effects suffered by the recipient" and that, "[c]onsequently, the assessment of whether speech constitutes a true threat mandates that the court consider the effect on the listener." *Id.* ¶ 67. The court held that when making that assessment, "application of the [objective] reasonable-person standard as to the harm caused by a true threat is" constitutionally permissible. *Id.* ¶ 68.

¶ 26 In this case, the trial judge specifically found that the threats allegedly made by the defendant were true threats pursuant to *Ashley* and accordingly were not protected by the first amendment. The defendant does not challenge this finding on appeal. Indeed, in his briefs on appeal, the defendant does not cite *Ashley* or provide any analysis related to the true threats doctrine at all. Accordingly, the defendant has forfeited any challenge to the trial judge's "true threats" finding. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Moreover, even in the absence of forfeiture, we would agree with the trial judge's finding.

11

¶ 27    We turn therefore to what the defendant does challenge in his briefs on appeal: whether the alleged threats in this case "contain[ed] specific facts indicative of a unique threat to the person, family or property of the officer and not a generalized threat of harm." We note that some of the defendant's arguments appear to imply that the statements in question must include facts that are both specific and unique. This is not what the plain language of the statute states. To the contrary, as noted above, the statute states that "[f]or purposes of a threat to a sworn law enforcement officer, the threat must contain specific facts indicative of a unique threat to the person, family or property of the officer and not a generalized threat of harm." 720 ILCS 5/12-9(a-5) (West 2020). Thus, the statute clearly states that it is the specific facts of the threat that indicate it is a unique threat, not that the facts must be both specific and unique. Accordingly, the proper question in this appeal is whether any rational trier of fact could have found beyond a reasonable doubt that the defendant's statements contained specific facts indicative of a unique threat to the person, family, or property of Officer Stuckemeyer, rather than only generalized threats of harm.

¶ 28    The defendant contends that the unpublished decision of our colleagues in the Second District in the case of *People v. Williams*, 2021 IL App (2d) 180736-U, is instructive as persuasive authority. The *Williams* court ruled that a conviction pursuant to section 12-9(a-5) must be reversed where the alleged threats in question "did not indicate the sort of harm" that would be inflicted on the officer "or how [the defendant] would inflict it." *Id.* ¶ 12. The court contrasted the facts before it with those found in *People v. Warrington*, 2014 IL App (3d) 110772, wherein the defendant specifically stated that he would headbutt the officer in question. *Williams*, 2021 IL App (2d) 180736-U, ¶ 14. The court ruled that in *Warrington* the defendant's statement that he would headbutt the officer meant that "the threat contained a specific fact," whereas in the case before it, "there was merely a general threat to cause harm." *Id.*

12

¶ 29    In this case, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the defendant's statements contained specific facts indicative of a unique threat to the person, family, or property of Officer Stuckemeyer, rather than only generalized threats of harm. A number of the defendant's threats to harm Stuckemeyer were very specific about the types of harm he intended to inflict and how he intended to inflict it. For example, the defendant threatened to "drop" Stuckemeyer, which Stuckemeyer testified meant, in slang terminology, that the defendant intended to kill Stuckemeyer by shooting him. Likewise, the defendant threatened to "surprise" Stuckemeyer and to "sit around and wait for [Stuckemeyer's] ass," which Stuckemeyer testified led him to believe that the defendant planned to ambush Stuckemeyer and possibly other officers as well. The defendant's threats also were very specific about when the harm would occur, with the defendant indicating that he would return to the police station the next day to exact his revenge on Stuckemeyer. Moreover, the threats were very specific about the fact that the defendant did not intend to carry out the threats solely by himself but intended to recruit as many other people as he could to help him carry out the threats. Although the defendant's threat that he would bring "50" other people to help him harm Stuckemeyer may have appeared to be exaggerated, this does not diminish the overall specificity of the threats. Viewed together, and in their proper context, the defendant's threats demonstrate that he was carefully and actively thinking, in detail, about how, when, and where to harm Stuckemeyer, not that he merely was "spouting off" or "lashing out" with generalized threats of harm. This is buttressed by the fact that although the defendant stated only that he wanted to punch Stuckemeyer in the face, rather than actually threatening to do so, the defendant's statement is further proof that he was thinking in detail about ways to physically harm Stuckemeyer, which could help lead a rational trier of fact to conclude that the defendant's actual threats were not merely generalized threats of harm.

13

¶ 30 Likewise, the defendant's threats against property in the care and custody of Stuckemeyer were also very specific. Stuckemeyer testified that the "several audible thumps" heard in parts of People's exhibit 1 were the sound of the defendant "kicking some interior part of the squad car" after having "threatened to kick the windows out of the squad car." When asked if, based upon the defendant's "build, height, weight," he believed the defendant was capable of damaging the car, Stuckemeyer testified, "Yes. In fact, we've had other vehicles damaged by arrestees who have attempted to force their way out of the car in the past." He testified that he believed the defendant was capable of kicking the window out, which the defendant stated "several times" that he intended to do. He agreed that, at one point, the defendant threatened to do it in three seconds and began to count to three. He testified that he believed that the defendant would attempt to break out the window. He testified that the defendant's legs were not restrained at the time the defendant was making these statements.

¶ 31 It is true that on cross-examination, Stuckemeyer agreed that during the transport of the defendant, the defendant was sitting upright in the back seat of the squad car, and that he did not see the defendant "go to his side or anything" during the entire trip. However, Stuckemeyer testified that he had observed people who were able to kick the window glass "without actually leaning to the side." He testified that these were "[s]mall or midsize" people and that it depended upon "the individual's flexibility." He agreed that the defendant was "a very large man" but testified that he believed that whether the defendant could have kicked out the glass window would depend upon the defendant's flexibility. When asked if the defendant was angry, Stuckemeyer testified as follows:

> "I would describe his demeanor as anger escalating to the point of rage. And from time to time, while he's screaming and yelling at me, I can feel the squad car moving around ***.
>
> *** I also felt the squad car move when he was—when, presumably, he's kicking some

interior portion of the squad car. I could hear the thumps. And immediately in conjunction with the thump, I could feel the squad car shift."

¶ 32 It is likewise true that on cross-examination, Stuckemeyer agreed that although the defendant counted to two after threatening to kick the window out on three, the defendant never got to three, because the defendant instead began talking about something else. However, he testified that he believed that the defendant "had worked himself up to the point where he was going to break the window out." He testified that he "was trying to mitigate the situation" by rolling down the window a bit for the defendant at the defendant's request. He reiterated that it was the defendant's demeanor and manner, as well as his words, that caused Stuckemeyer to take the defendant's statements as threats.

¶ 33 On redirect examination, Stuckemeyer testified that he believed it was possible that the defendant could kick out the back seat window. He agreed that in his police report, he stated that the defendant threatened to kick the window out, even though he did not put anything in the report about the defendant counting to three. The trial judge, when rendering his verdict on this count, concluded that the totality of the circumstances again demonstrated that

"[t]he defendant knew that this was a threat to be taken seriously because when the officer lowered the window, the defendant said he wasn't really going to do it but that his words got the officer to actually open the window. He knew his words were to be taken seriously as a threat."

The trial judge added that the defendant "tried to get the officer to do something and he accomplished it," which he again concluded was "a true threat." We conclude that the trial judge did not err with regard to this count either, because a rational trier of fact could determine from this testimony about the defendant's threats, and the defendant's actions accompanying those

15

threats, that the threats "contain[ed] specific facts indicative of a unique threat to the *** property of the officer and not a generalized threat of harm." See 720 ILCS 5/12-9(a-5) (West 2020).

¶ 34 Because, for the reasons stated above, a rational trier of fact could have found beyond a reasonable doubt the essential elements of the offenses of which the defendant was convicted, and because the evidence presented at trial is not so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant, we find no error in this case. See, *e.g.*, *Saxon*, 374 Ill. App. 3d at 416. We note that we would reach the same conclusion, and same result, if we adopted the standard requested by the defendant and applied *de novo* review to the claims raised by the defendant on appeal.

¶ 35                                    III. CONCLUSION

¶ 36 For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 37 Affirmed.

*People v. Perkins*, 2023 IL App (5th) 220108

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Champaign County, No. 21-CF-856; the Hon. Randall B. Rosenbaum, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and S. Amanda Ingram, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Edward R. Psenicka, Richard S. London, and Jaylaan Slaughter, of State's Attorneys Appellate Prosecutor's Office, of Elgin, of counsel), for the People. |