# Illinois Official Reports

## Appellate Court

*People v. Warrington*, 2014 IL App (3d) 110772

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON WARRINGTON, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0772 |
| Filed | April 2, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for threatening a public official, a police officer, was reversed and the cause was remanded for a new trial where the trial court erred by giving inconsistent instructions on the offense of threatening a public official, and neither the issues instruction nor the definition instruction included as an element of the offense the requirement, pursuant to subsection 12-9(a-5) of the Criminal Code effective at the time of defendant's arrest, that the State prove defendant communicated a unique threat to a police officer. |
| Decision Under Review | Appeal from the Circuit Court of Warren County, No. 11-CF-57; the Hon. Greg McClintock, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Bryon Kohut (argued), of State Appellate Defender's Office, of Ottawa, for appellant. |
|---|---|
| | Albert G. Algren, State's Attorney, of Monmouth (Thomas D. Arado (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion. Justices McDade and O'Brien concurred in the judgment and opinion. |

## OPINION

¶ 1    On April 23, 2011, defendant Aaron Warrington was arrested for the felony offense of threatening a public official, a police officer, and resisting arrest, a misdemeanor charge. The State charged defendant, by information, with threatening a public official, a Class 3 felony, but did not include the specific statutory language regarding the victim being a police officer. Eventually, the State filed a third misdemeanor count of fleeing and eluding a police officer.

¶ 2    The court held a jury trial on all charges. During the jury instructions conference, neither the court nor the parties recognized the People's tendered instructions did not include an element of the felony offense requiring the State to prove defendant communicated a "unique threat" to a police officer as a public official. Defendant argues that although the instruction issue was not properly preserved for review, plain error requires reversal of his felony conviction. Additionally, defendant contends the State presented insufficient evidence to prove him guilty of threatening a public official who is a police officer. We reverse and remand for a new trial.

¶ 3                                   BACKGROUND

¶ 4    On April 25, 2011, the State filed a two-count information against defendant. Count I alleged, on or about April 23, 2011, defendant committed the offense of threatening a public official, pursuant to section 12-9(a)(1)(i), (a)(2) of the Criminal Code of 1961 (the Code), a Class 3 felony. 720 ILCS 5/12-9(a)(1)(i), (a)(2) (West 2010). The information alleged defendant "knowingly conveyed to Terry Hepner, a sworn law enforcement officer for the City of Monmouth, Illinois, a public official, an oral threat to commit bodily harm to Terry Hepner, as such threat was made in such a way to place Terry Hepner in reasonable apprehension of immediate or future bodily harm and said threat was conveyed because of Terry Hepner's performance of a public duty." Counts II and III alleged the misdemeanor offenses of resisting a peace officer fleeing or attempting to elude a police officer.

¶ 5    The jury trial commenced on August 10, 2011. The State's first witness, Monmouth police officer Terry Hepner, testified he was stopped at a traffic light in a marked squad car, on April

23, 2011, when he heard loud music coming from defendant's vehicle from over 75 feet away. Officer Hepner conducted a traffic stop on defendant's vehicle because the loud music violated city ordinances. Once stopped, defendant told the officer it was a "bullshit stop." Officer Hepner advised defendant he was going to receive a citation for an ordinance violation and began to walk back to his squad car, when defendant said, "See ya, Hep," and sped off in his vehicle.

¶ 6 Officer Hepner caught up to defendant with his lights and siren activated. At that point, defendant did not stop, but turned southbound on an intersecting street. Officer Hepner followed defendant for several blocks until defendant turned into the long driveway of his girlfriend's residence, parked back near the garage, and exited his vehicle. Officer Hepner approached defendant and told defendant to place his hands on the squad car. Defendant kept his arms at his side and did not comply.

¶ 7 Officer Hepner grabbed defendant's left hand and secured it with a handcuff. When Officer Hepner tried to grab defendant's right hand, defendant pulled away, requiring Hepner to pin defendant's body against the squad car to restrain defendant's right hand. Officer Hepner told defendant to stop resisting so the officer could get defendant's right hand cuffed.

¶ 8 Defendant's girlfriend, Tuesday Birditt, came outside and, according to the officer, defendant "spun himself around," resulting in a "little struggle" which ensued for four to five minutes until Officer Hepner placed the right handcuff on defendant. Officer Hepner took defendant to the passenger side of the squad car, and defendant initially refused to sit in the squad, but he finally sat down. According to Hepner, defendant continued yelling the whole time and started spitting at the back window of the squad.

¶ 9 While en route to the police station, defendant asked Hepner whether the officer had children. Defendant told Hepner he knew where the officer lived, and he would have beaten Hepner's "ass" if Hepner had not been a police officer. Once they arrived at the jail, Officer Hepner said defendant told him he was going to "head butt" the officer while walking near the officer. Officer Hepner said he believed defendant's threats were actual threats against him.

¶ 10 The jury then viewed a DVD copy of the recording from the camera in Officer Hepner's squad car during defendant's arrest. Officer Hepner said the video portion of the incident did not record properly, showing only a white background; however, the audio recorded properly during the arrest and the sound was an accurate representation of the words exchanged between defendant and Officer Hepner.

¶ 11 Next, Anthony St. Clair testified, in the State's case in chief, that he was a college intern riding along with Officer Hepner on April 23, 2011. St. Clair's account of the incident was similar to Hepner's testimony.

¶ 12 Tuesday Birditt, defendant's girlfriend for nine years, testified she saw the officer approach defendant, who had his hands behind his back. Birditt testified, after the officer placed a handcuff on one of defendant's wrists, she saw the officer push defendant up against the vehicle. She stated she did not see defendant pull his other hand away from the officer. Birditt said she kept yelling at the officer to try to find out what was going on, and it was possible that she also yelled at defendant at that time. Birditt said defendant was yelling, hollering, and cursing after the officer pushed him against the vehicle, but she did not hear him make any threats. She said she did not think defendant was resisting until the officer pushed him against the vehicle.

¶ 13    Defendant testified, on the day of the traffic stop, a vehicle that was stopped behind him at the traffic light was playing loud music. After Officer Hepner stopped his vehicle, defendant denied playing his music too loudly and tried to explain why his music was not too loud when the officer returned to his squad car. According to defendant, he overheard Officer Hepner use profanity while at his squad car, and defendant became fearful and drove away from the scene because he had prior run-ins with this officer. Defendant testified he was afraid Officer Hepner might "possibly plant contraband in my vehicle."

¶ 14    Defendant thought Officer Hepner treated him unfairly because defendant used to date one of Hepner's ex-girlfriends approximately 10 years prior. Defendant testified Officer Hepner also did not like him because, approximately six years ago, defendant had photos of Officer Hepner that reflected badly on Officer Hepner, and defendant gave the photos to the press. Defendant mentioned those photos to Officer Hepner, at the traffic stop on April 23, 2011, and defendant asked the officer if he was going to keep harassing defendant because of those photos.

¶ 15    After defendant drove away from the initial traffic stop, he said he observed Officer Hepner's squad catch up to his vehicle and turn on his flashing lights, but defendant did not stop immediately, traveling a couple more blocks to Birditt's residence on 6th Street. When he parked the car in the driveway, defendant said he yelled for Birditt to come outside. Defendant said he complied with Officer Hepner's directive for defendant to put his hands behind his back. According to defendant, Officer Hepner placed one handcuff on defendant's left wrist and then "slam[med] my head into the quarter panel." Defendant agreed that a struggle occurred for "somewhere between three and six minutes." Defendant stated Officer Hepner finally let him up and placed the second cuff on his right hand. Two other Monmouth police officers, Corsaro and Benson, arrived at the scene at this point.

¶ 16    Defendant testified Officer Hepner repeatedly told him to get into his squad car but defendant attempted to talk to Officer Corsaro and did not get in the squad. Officer Hepner then forced defendant into the squad car. Defendant observed the officers searching the vehicle he had been driving and he observed Birditt run up to the vehicle telling the officers it was her car and they should not tow it. Defendant said this further upset him.

¶ 17    Defendant denied telling Officer Hepner he was going to "beat his ass," but admitted saying he would beat his ass when the officer retired. Defendant said it was Easter weekend and he would not be able to be with his own child on Easter if he was arrested, which was why he asked Hepner if he had any children. Defendant told Officer Hepner he was "going to put [his] business out there," meaning he had a lot of "dirt" on the officer, but he did not attempt to "head butt" Officer Hepner. While in the lobby of the jail, defendant said he was "discussing the photos" again when Officer Hepner turned him over to the booking officers.

¶ 18    On cross-examination, defendant stated he knew Officer Hepner lived near his own house and knew Officer Hepner had children. Defendant said he did not threaten to harm Officer Hepner's children during this incident. Defendant admitted to telling Officer Hepner he knew where he lived at the time he asked him about Officer Hepner's children. Defendant said he and Officer Hepner were "talking smack" back and forth to each other.

- 4 -

¶ 19    During the jury instruction conference, the State tendered People's Instructions Nos. 1 through 23.[1] Defendant's attorney objected to a single instruction, People's Instruction No. 12, the issues instruction for the felony offense. The transcript of the jury instructions conference reflects the following discussion of People's Instructions Nos. 10, 11 and 12, pertaining to the charge of threatening a public official:

"THE COURT: I.P.I. 11.49, People's instruction 10, modified 11.49; no objection, is that correct?

[DEFENSE COUNSEL]: I think that's accurate.

THE COURT: People's instruction 11 modeled on [I.P.I.] 11.49 A, no objection, correct?

[DEFENSE COUNSEL]: That is correct.

THE COURT: People's instruction 12 modeled on [I.P.I.] 11.50 [the issues instruction], no objection, is that correct?

[DEFENSE COUNSEL]: If I may just have a moment, Judge. I'm sorry, Judge, I don't have a copy of the I.P.I., but one thing I notice there is a variance between the instruction and the charge. The charge indicates is that the charge took place in that the officer [was] in apprehension of immediate and bodily harm. I notice that isn't in the I.P.I. instruction tendered and am not familiar enough with that instruction to know if that is an omission.

[PROSECUTOR]: I had a question [on] that one myself. I think Mr. Algren was going to check this and would ask to do that again.

THE COURT: Well, we've had two days to go over these instructions.

[PROSECUTOR]: Give it then.

THE COURT: Well, are you tendering this instruction or not?

[PROSECUTOR]: Yes.

THE COURT: Mr. Siegel, are you tendering the instruction?

[DEFENSE COUNSEL]: Yes, to indicate that the officer was not in reasonable apprehension?

THE COURT: And your response?

[PROSECUTOR]: No.

THE COURT: I believe it should include the language of reasonable apprehension of immediate and future bodily harm in between inflict and bodily harm. With that change it will be given. If that change is made does that resolve your objection?

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: Then the State will modify that."

After closing arguments, the jury returned guilty verdicts on all three counts.

¶ 20    The court ordered a presentence investigation report and held the sentencing hearing on September 26, 2011. For the Class 3 felony of threatening a public official charge (count I), the

---

[1]The appellate record does not include the numbered jury instructions, but only the unnumbered instructions actually given to the jury; therefore, any specific references to the instruction numbers for each party, as well as the Illinois Pattern Jury Instruction (IPI) number associated with them, were discussed in the transcript of the jury instruction conference.

court sentenced defendant to 30 months of conditional discharge with conditions that defendant serve 120 days in jail, concurrent with counts II and III, to submit to a DNA analysis and pay the $200 fee "if not previously submitted," and to pay "court costs only."

¶ 21 The court also entered a judgment and conviction on the two misdemeanor charges of resisting a peace officer and fleeing or eluding a police officer, counts II and III. For the resisting a peace officer charge, the court entered a conviction and sentenced defendant to serve 120 days in jail, concurrent with counts I and III, and to pay "court costs only." For the fleeing or eluding a police officer charge, the court entered a conviction and sentenced defendant to serve 30 days in jail, concurrent with the other counts, and to pay "court costs only."

¶ 22 Defendant did not file a posttrial motion, but filed a timely notice of appeal regarding his felony conviction for threatening a public official.

¶ 23                                                    ANALYSIS

¶ 24 On appeal, defendant challenges only his felony conviction for threatening a public official and does not raise any issues regarding his misdemeanor convictions. Defendant argues he is entitled to a new trial due to improper and conflicting jury instructions. Additionally, defendant contends the State did not prove him guilty beyond a reasonable doubt of the offense of threatening a public official. Finally, defendant claims he should be awarded one additional day of credit for time served in presentence custody and should receive $5 per day for presentence incarceration credited against his Child Advocacy Center Fund fee (CAC) of $30 and his Violent Crime Victims Assistance Fund fee (VCV) of $20 should be reduced.[2]

¶ 25 The State claims defendant forfeited review of the jury instructions issue and contends it proved defendant guilty, beyond a reasonable doubt, of the offense of threatening a public official as charged. The State concedes the credit issues, but denies defendant's VCV fee should be reduced.

¶ 26                                      I. Jury Instruction Errors

¶ 27 We first address whether the trial court properly instructed the jury with respect to the charged felony offense. Specifically, the State's information alleged defendant committed the more general felony offense of threatening a public official under section 12-9(a)(1)(i), (a)(2) of the Code (720 ILCS 5/12-9(a)(1)(i), (a)(2) (West 2010)), which is not specific to circumstances where a police officer, as a public official, is the target of a purported threat. The charged section of the statute provides:

"A person commits the offense of threatening a public official when:

(1) that person knowingly and willfully delivers or conveys, directly or indirectly, to a public official by any means a communication:

(i) containing a threat that would place the public official or a member of his or her immediate family in *reasonable apprehension* of immediate or future bodily harm, sexual assault, confinement, or restraint[.]" (Emphasis added.) 720 ILCS

---

[2]The clerk's fee sheet, in the record, shows costs were "[o]rdered on October 3, 2011," and 13 different fees were assessed by the clerk totaling $325, including the $30 CAC and $20 VCV fees at issue.

5/12-9(a)(1)(i) (West 2010).

¶ 28    After the defense objected, the State modified People's Instruction No. 12, the issues instruction for threatening a public official. The modified People's Instruction No. 12, tendered to this jury, in relevant part, provided:

"To sustain the charge of threatening public officials, the State must prove the following propositions:

First Proposition: That the defendant knowingly and willfully delivered or conveyed, directly or indirectly, a threat to place Terry Hepner *in reasonable apprehension* of immediate or future bodily harm; and

Second Proposition: That Terry Hepner was a public official at the time of the threat; and

Third Proposition: That the threat was contained in an oral statement; and

Fourth Proposition: That the threat was conveyed because of the performance or nonperformance of some public duty; and

Fifth Proposition: That when the defendant conveyed the threat, he knew Terry Hepner was then a public official." (Emphasis added.)

¶ 29    Without objection, the court gave the jury People's Instruction No. 10 defining the offense of threatening a public official, without the reasonable apprehension language. It is clear from a simple comparison of the two jury instructions that People's Instruction No. 10 and People's Instruction No. 12 were inconsistent. For example, the issues instruction required the jury to consider whether the communicated threat by defendant caused the public official to form a *reasonable apprehension* of immediate or future bodily harm while the definition instruction did not include the requisite reasonable apprehension language.[3]

¶ 30    It is undisputed that defense counsel did not challenge the conflicting instructions in a posttrial motion. Typically, a defendant forfeits review of a jury instruction error by failing to address the instruction issue in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). However, Illinois Supreme Court Rule 451(c) allows for review of jury instruction errors under a limited exception and provides: "[S]ubstantial defects are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. July 1, 2006). When conflicting instructions are given, one being a correct statement of law and the other an incorrect statement of law, our supreme court has held the error cannot be deemed harmless. *People v. Pollock*, 202 Ill. 2d 189, 212 (2002) (citing *People v. Bush*, 157 Ill. 2d 248, 254 (1993)). "[T]he issue of whether the jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 31    Here, the court not only erred by giving the jury inconsistent jury instructions regarding the offense of threatening a public official, more importantly, neither the issues nor definition instruction included an element of the offense requiring the State to prove defendant communicated a unique threat to a police officer. Specifically, effective June 1, 2008, subsection 12-9(a-5) of the Code was added to the statute by Public Act 95-466 (Pub. Act 95-466, § 5 (eff. June 1, 2008)) to address situations when the public official targeted by a

---

[3]We note that the Illinois Pattern Jury Instructions, Criminal, No. 11.49 (4th ed. 2000) (hereinafter, IPI Criminal 4th) and IPI Criminal 4th No. 11.50, the definition and issues instructions, do not include "reasonable apprehension" language and, therefore, do not track with the statute.

threat was a police officer. Section 12-9(a-5) of the Code, effective at the time of defendant's arrest, provided:

> "For purposes of a threat to a sworn law enforcement officer, the threat must contain specific facts indicative of a unique threat to the person, family or property of the officer and not a generalized threat of harm." 720 ILCS 5/12-9(a-5) (West 2010).

Although the State did not allege defendant violated section 12-9(a-5) of the Code, the recent decision of *People v. Hale*, 2012 IL App (4th) 100949, holds that the exclusion of the "unique threat" element in the jury instructions constituted plain error requiring a new trial. *Id.* ¶ 24. Thus, we reverse defendant's felony conviction for threatening a public official and remand for a new trial with a properly instructed jury.[4]

¶ 32　　Defendant also raised issues regarding his credit for time served in presentence incarceration and monetary credits against fines for presentence incarceration. Since defendant only raises these issues on appeal related to the sentence imposed following his conviction for the offense of threatening a public official, which is now reversed, we will not address these issues in this opinion.

¶ 33　　　　　　　　　　　　　II. Sufficiency of the Evidence

¶ 34　　Defendant also argues the State did not prove him guilty beyond a reasonable doubt of threatening a public official where the public official is a police officer. As stated above, in 2008, subsection 12-9(a-5) of the Code was added to the statute by Public Act 95-466 (Pub. Act 95-466, § 5 (eff. June 1, 2008)) to address situations when the public official targeted by a threat was a police officer. Prior to that statute, police officers did not fall under the definition of a "public official" for purposes of that statute. It is a well-established fundamental rule of statutory construction that "where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied." *People v. Botruff*, 212 Ill. 2d 166, 175 (2004) (citing *Knolls Condominium Ass'n v. Harms*, 202 Ill. 2d 450, 459 (2002)). Thus, in order for a defendant to be found guilty of threatening a public official when a threat is made to a sworn law enforcement officer as a public official, a "unique threat" is an essential element of the offense and " 'the threat must contain specific facts indicative of a unique threat to the person, family or property of the officer and not a generalized threat of harm.' " *Hale*, 2012 IL App (4th) 100949, ¶ 20 (quoting 720 ILCS 5/12-9(a-5) (West 2008)).

¶ 35　　In reviewing the sufficiency of the evidence, viewing the evidence in a light most favorable to the prosecution, it is the duty of this court to determine whether any rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The reviewing court does not resolve conflicts in the evidence or the credibility of the witnesses. *Id.* In this case, looking at the totality of the evidence in a light most favorable to the State, and applying that evidence to all of the elements, including the "unique threat" element, we conclude there was sufficient evidence to support defendant's conviction; therefore, there is no double jeopardy impediment to a new

---

[4]We note the pattern criminal jury instructions for threatening a public official (IPI Criminal 4th Nos. 11.49, 11.49A, and 11.50) have not been updated since the enactment of Public Act 95-466, § 5 (eff. June 1, 2008).

trial.

¶ 36                                                  CONCLUSION

¶ 37          For the foregoing reasons, we reverse defendant's conviction for threatening a public official, vacate that judgment of the circuit court, and remand that count for a new trial.

¶ 38          Reversed and remanded.