NOTICE

Decision filed 04/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240866-U

NO. 5-24-0866

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 18-CF-478 |
| | ) | |
| XAVIER LEWIS, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CLARKE* delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence at trial was sufficient to sustain the defendant's convictions for aggravated battery with a firearm and aggravated discharge of a firearm.

¶ 2    A jury found the defendant, Xavier Lewis, guilty of one count of aggravated battery of a peace officer with a firearm (720 ILCS 5/12-3.05(e)(2) (West 2016)), one count of aggravated discharge of a firearm at a peace officer (*id.* § 24-1.2(a)(2)), and one count of cannabis trafficking (720 ILCS 550/5.1(a) (West 2016)), all Class X felonies. The trial court sentenced the defendant to 24 years' imprisonment for aggravated battery with a firearm, 13 years for aggravated discharge of a firearm at a peace officer, and 12 years for cannabis trafficking. On appeal, the defendant challenges the sufficiency of the evidence to convict him at trial, arguing that no evidence was

_____

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has read the briefs.

1

presented at trial to establish that he aided or participated in the shooting. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The facts necessary to our disposition of this appeal are as follows. On July 31, 2016, Officer Trey Harris was shot in the head while attempting to apprehend individuals in a Grand Prix who were suspected of shooting firearms near Robert A. Stalls Avenue in Carbondale, Illinois. The original shooting was retaliation for an intentional underpayment in a cannabis transaction involving Darien Williams-Wright (DJ) and Brandon Jones (Brandon).

¶ 5     On November 14, 2018, a grand jury returned a four-count indictment against the defendant, charging him with: (1) conspiracy to possess cannabis with intent to deliver, (2) aggravated battery of a peace officer with a firearm, (3) aggravated discharge of a firearm at a peace officer, and (4) cannabis trafficking. The firearm-related counts were premised on a theory of accountability, in which the State alleged that the defendant was legally responsible for Alex Karcher's actions. Specifically, for the aggravated battery count, the State alleged that Karcher knowingly discharged a .223-caliber firearm, causing injury to Officer Harris, whom both men knew to be a peace officer performing official duties. For the aggravated discharge count, the State alleged that Karcher fired a .223-caliber weapon in the direction of a vehicle known to be occupied by a peace officer. The cannabis trafficking count alleged that the defendant knowingly brought more than 5,000 grams of cannabis from Oregon into Jackson County, Illinois, and Williamson County, Illinois, for delivery. These charges arose from a series of cannabis-related incidents in late July 2016, culminating in a high-speed police chase on July 31, 2016, during which Officer Harris was shot in the head and ultimately lost vision in his right eye. Following the indictment,

2

the trial court issued an arrest warrant, but the defendant was not apprehended until January 11, 2022, when he was located in Otero County, Colorado.

¶ 6     On October 31, 2023, the defendant proceeded to a jury trial on charges of aggravated battery of a peace officer with a firearm, aggravated discharge of a firearm at a peace officer, and cannabis trafficking. At trial, Brandon, a participant in the cannabis trafficking scheme, testified that he first met the defendant in Salina, Kansas, around 2008 or 2009 while they were in high school. After Brandon returned to Illinois, the two began working together buying and selling cannabis. Brandon said that their operation involved transporting cannabis between multiple states. At times, he would travel to Kansas to obtain cannabis from the defendant, while on other occasions it was delivered to him. He eventually learned that the cannabis originated from suppliers in Oregon. The defendant introduced Brandon to the suppliers, and although Brandon later traveled to Oregon to purchase cannabis directly, he testified that he did not communicate with the suppliers independently; instead, all arrangements and communications continued to be handled through the defendant.

¶ 7     By 2016, Brandon testified that he was distributing cannabis in large quantities, with DJ acting as one of his dealers. In July 2016, DJ arranged a transaction with individuals later identified as Robert Harris ("Yay") and Judious Kizeart ("Ju-Ju") for approximately 15 pounds of cannabis, valued at around $50,000. Brandon explained that although he had been handling larger deals at the time, this particular shipment had been "fronted" to him through his and the defendant's Oregon source.

¶ 8     On the day of the transaction, Brandon met DJ and provided him with the cannabis, expecting DJ to complete the sale with Yay and Ju-Ju and return with the full payment. However, Brandon became suspicious when the exchange occurred unusually quickly, believing DJ could

3

not have properly counted the money. When Brandon saw the money, he knew he had been ripped off because the stacks were filled with $1 bills on the inside and $100 bills on the top and bottom. Brandon testified that after arguing with DJ, he called the defendant and informed him that he had been ripped off and that the money that was owed would be short or late. According to Brandon, it was clear to him that the defendant wanted to get their cannabis back.

¶ 9    Brandon further testified that a few nights before the shooting, the defendant arrived at his stash house on Power Plant Road in Williamson County. When the defendant arrived, he was accompanied by Karcher, Xavier McCray, and another man, later identified by Special Agent Justin Haney as Matthew Manley. Brandon stated that there were multiple guns at the stash house, some of which were brought with the group from Kansas, including multiple .223-caliber assault rifles.

¶ 10    After some discussion about the cannabis that was stolen, Brandon contacted DJ and had him meet some of the group members at Walmart to bring him back to the stash house. Brandon stated that he had DJ meet them at Walmart because he did not want DJ to know the exact location of his stash house. Brandon testified that at Walmart, DJ got into his truck, and he put a hood over DJ's head to obscure DJ's vision as he drove to the house. Brandon stated that DJ was brought to the stash house because he believed DJ had a better relationship with Yay and Ju-Ju, who ripped them off, and might be able to help locate them. Brandon also said that DJ needed to be there because it was his responsibility to get the cannabis back, since it was his fault that they were ripped off. Once at the stash house, Brandon said that he sat back, distancing himself from the situation, as the defendant and other men from Kansas took over, and DJ made calls to try to determine where the cannabis could be.

4

¶ 11    Brandon testified that over the next couple of days, DJ was showing the group locations in Carbondale, where he thought the cannabis might have been stashed. Over that period, the group drove in Brandon's truck, a friend's Malibu, and a gold Grand Prix that Brandon had someone buy to look for the stolen cannabis. Brandon stated that he bought the Grand Prix because his truck was noticeable, and he did not want people to recognize him. However, Brandon testified that the defendant mostly drove the Grand Prix. During the trips to look for the stolen cannabis, Brandon denied ever firing a gun and did not recall seeing the defendant with a gun. Brandon further testified that he was present when a gun was fired during one of the trips to Carbondale, and, at that time, Karcher, McCray, or Manley was in the back seat and fired the gun.

¶ 12    On the night Officer Harris was shot, Brandon testified that he met the group at the stash house in the afternoon, and guns were loaded into both cars. The group then drove to Carbondale in two vehicles, the borrowed Malibu and the Grand Prix. Brandon confirmed on that night he was driving the Malibu with Karcher and Manley as passengers. Prior to the shooting, Brandon parked outside of a house while the defendant and McCray, who were riding in the Grand Prix, looked around the outside of the house because DJ had indicated that the cannabis might be stored there. Because the defendant and McCray were taking a long time, Brandon told Karcher to get out of the Malibu and check on them. Eventually, Brandon, because he did not feel they were getting anywhere and wanted to end the search, drove off with Manley as a passenger to an empty lot to wait for the others. When the defendant, McCray, and Karcher, who were in the Grand Prix, arrived at the parking lot, Brandon said to everyone, "let's just go," but the defendant, McCray, and Karcher, who were in the Grand Prix, indicated that they were going to go around the block one more time.

5

¶ 13    Brandon stayed in the parking lot, and a couple of minutes later, he saw the Grand Prix quickly drive by, with the police with their lights and sirens activated in pursuit. Brandon testified that he understood, based on what he saw, that the group in the Grand Prix was fleeing the police, so he left the parking lot and drove in the opposite direction. Brandon stated that he spoke to the defendant on the phone during the police pursuit, and he gave the defendant directions on where to drive. Brandon also stated that at some point, he thought he had received a text from the defendant stating that they had lost the police, but he could not remember.

¶ 14    Brandon testified that while driving back to the stash house, he encountered police because "they had the roads closed off," but that after the police "looked in the car," he was allowed to pass by. Thirty minutes after Brandon arrived at the stash house, the defendant, Karcher, and McCray also returned to the stash house. Brandon stated that when the three arrived at the stash house, McCray and Karcher still had guns with them. Brandon also stated that he believed that Karcher was acting "a little panicky."

¶ 15    A short time later, Brandon took his money out of the stash house and went to swap cars to get his truck back. Brandon explained that he took the money because the police had closed roads and he assumed "something bad happened," and he thought it might reflect on him, so he wanted to get out of the area. When Brandon left the stash house, he left behind 40 to 50 pounds of cannabis at the stash house, which was later seized by the police. Brandon testified that he only learned of the shooting from his friend when he went to retrieve his truck. Brandon further stated that, after learning an officer had been shot, he called the defendant, and the defendant said that "we're leaving." Brandon further confirmed that the cannabis that was seized from the stash house came from the contact in Oregon he was introduced to by the defendant.

6

¶ 16 During the course of the investigation, Brandon was arrested and charged. Brandon pled guilty and received 15 years for conspiracy to deliver cannabis and 18 years for cannabis trafficking. Brandon testified that he served his entire sentence in the Illinois Department of Corrections; however, as part of his plea deal, he was required to testify at any future trial regarding the incidents.

¶ 17 DJ's testimony corroborated Brandon's, including that he sold cannabis for Brandon, he knew Brandon got the cannabis through his contact with the defendant, and that he failed to count the money in the 15-pound cannabis deal. DJ's testimony also provided more information, including that after Brandon was ripped off, DJ called Ju-Ju, who came back to his house and tried to explain that he had nothing to do with it. DJ also stated that when he went to meet some of the group at Walmart, the individuals he met were Brandon, the defendant, McCray, and another individual he did not know. DJ testified that when he arrived at the house, he saw multiple guns on the kitchen island, including "three or four AR's, AR-15's, [and] a couple handguns." DJ stated that he was "kind of scared," but told them he would show them areas where Yay and Ju-Ju hang out.

¶ 18 When the group took DJ to Carbondale, he pointed out a couple of areas, but he "didn't really want to tell them exactly certain spots that they might be" because he "didn't want nothing to happen to them." At one point, DJ was dropped off by the defendant in the "champagne colored car" to meet Ju-Ju, as the group drove around the block. After the group circled back around the block a second time, DJ called Ju-Ju and warned him not to come because he thought something bad might happen to him, because the defendant and two others "had the AR's in their hands." When Ju-Ju did not meet DJ, the defendant drove down Dillinger Road to drop him off at a hotel.

7

¶ 19 Later that "same day or the next day," DJ had a "little get-together" at a house in Murphysboro before turning himself in to the Jackson County jail for an unrelated 45-day sentence. DJ testified that during the get-together, Brandon arrived at the Murphysboro house uninvited and told him to keep a man called "Schmitty" there, which DJ agreed to do because he "didn't know what to do." Approximately an hour later, the defendant and McCray, also uninvited, arrived at the Murphysboro house. DJ testified that when the defendant and McCray arrived, "one had an AR, one had a pistol in their hand." DJ stated that the defendant and McCray told everyone to "get in the house and lay down, get on the floor," and give them their phones. Everyone complied with the demands, then the defendant and McCray "got on Schmitty." They demanded that he tell them where Ju-Ju was or they were "going to do something to him." Before leaving, they took Schmitty's cannabis and roughly $40, then they placed everyone's phones on the back of a truck and left. At that time, everyone else left, and DJ went to his uncle's house, "four or five blocks" away in Murphysboro, to hide because he was told there were shootings happening on the east side of Carbondale. DJ also testified that Brandon called him multiple times, telling him to break his phone, which he did.

¶ 20 DJ further testified that the following morning, he was informed by his girlfriend or her roommate that an officer had been shot. Later that day, when DJ's mom picked him up to turn himself in to the Jackson County jail, he brought with him a lunchbox containing cannabis. Officers pulled his mother's car over and found the cannabis; as a result, DJ was charged with delivery of cannabis. DJ received four years' probation, stemming from the incident. At the time of the defendant's trial, DJ was in federal custody awaiting trial on charges of possession and distribution of methamphetamine. DJ testified that his testimony against the defendant would be considered in mitigation during his sentencing in federal court.

¶ 21    Officer Harris, who stated his last active day on the Carbondale police force was July 31, 2016, testified that on July 30, 2016, he responded to a "shots fired" call on Oak Street in Carbondale. However, because it was dark, he and the other responding officers could not find any evidence to support the call. The next day, on July 31, 2016, when he reported in for his shift, he learned that other officers had turned in during the day and located spent shell casings and damage to a home in the area.

¶ 22    That evening, Officer Harris was partnered with Corey Brinkley in a marked squad car. Harris was the passenger officer while Brinkley drove. Due to the shots-fired call the night before, Officer Harris and Brinkley decided to patrol that particular area. While in the area, northbound on Robert A. Stalls, Officer Harris and Brinkley heard gunfire coming from the south. Officer Harris testified that they determined they needed to turn around to drive to the scene where they believed the shooting likely happened. However, halfway through the U-turn, they saw a car pass them, which, according to Officer Harris's testimony, was a tan-colored Grand Prix heading northbound at a high rate of speed. The State, during Officer Harris's testimony, published the audio-less dashcam footage of the pursuit, which confirmed that Officer Harris's testimony was accurate: the officers performed a full 360-degree U-turn and began pursuing the vehicle with their lights and sirens activated.

¶ 23    Officer Harris's role while Officer Brinkley drove was to utilize the call radio and communicate with dispatch and other agencies. Officer Harris stated, and the video confirmed, that they eventually caught up to the speeding car. Officer Harris testified that he called out the license plate and the make and model over the radio, which was confirmed when the State published the audio of the police radio traffic at the time of the shooting. Officer Harris explained, and the dashcam footage confirmed, that the pursuit continued onto Dillinger Road, where the cars

9

had to maneuver an S-turn. Officer Harris further testified that at the final turn, the speeding car slowed down in front of them, and a passenger in the vehicle, who was sitting on the window ledge with a rifle, began shooting at their squad car.

¶ 24    As bullets hit the windshield and skipped off the hood of the patrol car, Officer Harris was shot in the head, with what he believed was the first round. After being shot, Officer Harris conveyed over the radio that he had been shot. Both officers then got out of the car to seek refuge behind their squad car and prepare for what was believed to be a "gun fight." However, as seen in the dashcam video, the Grand Prix drove away. Realizing that the car had fled and likely was not returning, Officer Brinkley tried to render aid to Officer Harris while waiting for an ambulance before ultimately determining that they needed to get back into the car to go to the hospital. Officer Harris then detailed what happened at the hospital, including his surgeries, the trajectory of the bullet in his face, the damage it caused, and stated that the bullet remained in his sinus cavity and still causes complications.

¶ 25    Officer Brinkley's testimony corroborated Officer Harris's, including that while in the area of Robert A. Stalls Avenue, they heard "excessive and numerous gunshots" coming from the south, before being passed by a gold-colored Grand Prix driving at an "extremely high rate of speed." Officer Brinkley testified that their pursuit of the vehicle continued onto Dillinger Road, reaching speeds up to 80 miles per hour. Officer Brinkley also confirmed that neither he nor Officer Harris discharged their weapons at any point. On cross-examination, Officer Brinkley also testified that at no point could he identify any of the individuals in the Grand Prix.

¶ 26    Jared Jones, a participant in the cannabis trafficking scheme, testified that he was not present when Officer Harris was shot, but he received multiple calls afterwards informing him. Jared stated, "I went into a panic, you know, understanding the ramifications of what was going to

10

happen, so I kind of went into what can I do to prevent this." Jared then went to the house "where we stashed our cannabis," on Power Plant Road. When Jared arrived at the house, the defendant, Karcher, and two others were present.

¶ 27   Jared explained that the next morning, he returned to the house alone to try to "clean up" whatever he could to "make everything go away." Jared stated that he "removed *** any contraband that was related to any shooting or any firearms or anything like that." Jared testified that he removed guns, ammunition, and any spent shell casings that he found. To get rid of the items, Jared stated, "I got some Quikrete, I put it inside of totes and I mixed it and I laid the firearms and ammunition and everything in it." Once the totes were filled with the firearms, ammunition, and concrete, Jared explained that to get rid of the items embedded in the concrete, he loaded the totes into his truck and brought them to "a few bodies of water in the area" and either slid or rolled the totes into the water.

¶ 28   Jared further testified that as part of his guilty plea for his part in selling the cannabis, he agreed to assist officers in their investigation. When officers asked about the concrete, he told them what he did to dispose of the guns and ammunition. Jared also told officers where to find the blocks, and later he rode with them to point out exactly where they were placed in the water. During cross-examination, Jared stated that he did not agree to testify as part of his agreement, but he did agree to make a proffer as to his involvement.

¶ 29   The State then presented officer investigation testimony and forensic evidence of the three shootings that occurred while the defendant was in Illinois. Deputy chief of the Carbondale Police Department, Anthony Williams, explained that in July of 2016, he was the Carbondale Police Street Crimes Unit sergeant. Chief Williams testified that at 3:03 a.m., on July 30, 2016, the department received phone calls reporting that shots had been fired on the northeast side of

11

Carbondale, but none of the reports pinpointed exactly where it occurred. Officers were dispatched to that area, but nothing was found. The next morning, a city resident reported that her house had been struck by gunfire the night before, which was determined to be in the same area as the reports from earlier that morning. It was also determined that the resident was Ju-Ju's aunt. When officers arrived at the house, they located eight spent .223 casings on the road near the intersection of Marion and Oak Street.

¶ 30    Chief Williams testified that on July 31, 2016, he was called into the police department for an officer-involved shooting, and he was also informed that the suspect vehicle was a gold Pontiac. Chief Williams then dispatched crime scene detectives to the shooting scene at Robert A. Stalls Avenue and Willow, and the scene on Dillinger Road. The department also put out directives to other agencies to be on the lookout for the vehicle.

¶ 31    The following day, on August 1, 2016, the Grand Prix was located on Dewmaine Road near Colp, Illinois, on fire. Chief Williams testified that the vehicle was positively identified as the suspect vehicle because a license plate was found near the car. Chief Williams stated that crime scene investigators were dispatched to the vehicle. While the suspects' identities were initially unknown, the department began receiving tips that Brandon and DJ were somehow involved. Chief Williams testified that detectives were then sent to the Jackson County jail to speak to DJ, who was serving a 45-day sentence for an unrelated crime.

¶ 32    During the interview with DJ, officers learned the names of McCray, Karcher, and the defendant, who were believed to have been involved in the shooting. Officers also learned that McCray, Karcher, and the defendant came to Carbondale from Salina, Kansas, in a white F-150 truck equipped with a brush guard and Kansas plates. Officers were able to retrieve photographs of the truck from Kansas, heading toward Carbondale, using a license plate reader. Officers also

retrieved video of the truck in Carbondale. Although officers did not see the defendant driving the truck, they did obtain photos of the defendant and Manley in Carbondale and videos of the truck in Jackson and Williamson Counties. Weeks after the shooting occurred, the vehicle was located in Wichita, Kansas. Within the truck, officers found a traffic crash report with the defendant's name on it and a letter addressed to the defendant at an Oregon address.

¶ 33    Ray Sutton, who was an Illinois State Police (ISP) crime scene investigator assigned to help investigate the shooting of Officer Harris, testified that he was dispatched first to Robert A. Stalls Avenue to process the scene. He described the photographs taken and the evidence retrieved at that scene. The evidence included a Pontiac Aztec that was hit by gunfire, a bullet projectile casing, and a dumpster struck by gunfire. Sutton then went to the Dillinger Road scene, where Officer Harris was shot. The scene revealed blood in the roadway and shell casings—including seven Federal .223 rifle casings. Later that morning, Sutton was called to Dewmaine School Road scene where the burned vehicle was found. At the scene, Sutton photographed the license plate and vehicle identification number (VIN) to identify the owner. The car was towed to an impound lot. The interior revealed eight shell casings, including Hornady 9-millimeter Luger and .223 Federal Remington.

¶ 34    On August 7, 2016, Sutton processed the scene at the stash house on Power Plant Road. The scene revealed six fuel cans and various pieces of broken concrete, one of which appeared to have the impression of a rifle sling swivel. Sutton returned to the residence on August 17, 2016, to search for shell casings in the yard to determine if they matched the casings at the Dillinger Road scene. Sutton found a total of five discharged cartridge cases in the yard: three Federal cartridge .223 Remington shell casings and two .380-caliber shell casings.

¶ 35    James Minckler testified that at the time of the investigation, he was an ISP crime scene investigator. Minckler identified the photographs he took of the Grand Prix and the Carbondale police vehicle involved in the shooting. Using the photographs, Minckler identified three circular defects in the windshield of the police vehicle, two graze marks on the hood, and a circular defect on the lower left side of the vehicle, which were consistent with bullet holes and markings. Minckler also testified that he took photographs at the Power Plant Road residence. The pictures included a kitchen cleaner left on the countertop, a lid for a plastic Pelican rifle case, a pry bar also on the countertop, various remnants of concrete material on the floor, and wood removed from the floor. Photographs also showed a cabinet with miscellaneous trash bags and heat-seal bags, some of which contained a leafy green substance. Additional photographs were taken in the garage where a safe was located. Inside the safe were bags containing heat-sealed bags containing a leafy green substance. Those items were placed in evidence by the drug task force.

¶ 36    In 2018, as a part of the investigation, Minckler accompanied officers to Schillings ditch, a water inlet in Jackson County connecting to the Mississippi River, where blocks of concrete suspected of containing firearms related to the shootings were located. Minckler identified the photographs he took of the area where the blocks were found and of the recovered concrete blocks, which appear to be in the form of plastic tote bins. Photographs also showed what appeared to be ammunition embedded on the side of one of the blocks. The blocks were then placed in evidence.

¶ 37    Jason Craddock, a crime scene investigator with the ISP, identified photographs he took at Herrin Lake on August 8, 2018, in connection with the investigation of the concrete blocks suspected of containing firearms related to the shooting. Photographs showed recovered concrete chunks that appeared to have been separated. The photographs also depicted what appeared to be

14

a broken gun stock of a rifle or shotgun embedded in the concrete and a rifle barrel with concrete stuck to it. Those items were then placed in evidence.

¶ 38    Curtis Eggemeyer, who was an ISP officer assigned to the Southern Illinois Drug Task Force at the time of the investigation, testified that he was involved with the search of the residence on Power Plant Road on August 2, 2016. Eggemeyer found a large number of heat-sealed bags containing a leafy green substance believed to be cannabis inside the safe in the home's garage and inside the kitchen cabinet. After the bags were placed in evidence, they were processed for fingerprints and taken to the evidence lab.

¶ 39    Thanarat Viriyakul, employee of the ISP Forensics Laboratory in Metro East, examined some of the bags found at the residence on Power Plant Road. The bags he analyzed tested positive for cannabis. The amounts examined exceeded 5,000 grams, so he did not analyze the remaining evidence.

¶ 40    Angela Horn, a forensic scientist employed with the ISP Division of Forensic Services, testified that she specialized in firearms and toolmark identification. She examined the seven Federal .223 Remington cartridge cases collected in this case from Dillinger Road and found they were all fired from the same rifle. She also examined the five cartridges obtained from the backyard at 854 Power Plant Road. Three of them were .223 Remington fired cartridge cases, and two were .380-auto caliber cartridge cases. The three .223 Remington fired cartridge cases were identical to the seven from the original scene. Two of those were fired from the same rifle as the seven addressed earlier. Horn also testified that the cartridge casings collected from the Oak Street shooting on July 30, 2016, "had been identified as having been fired in the same firearm." However, it was not the same firearm as the Dillinger Road shooting, so there were at least three firearms involved in the investigation.

15

¶ 41    Horn also testified that she performed tests on the blocks of concrete and their contents. The first block weighed roughly 500 pounds. To access the contents of the block, Horn had to use a handheld metal detector and a sledgehammer to open it. Once inside the first block, Horn discovered three firearms; however, the firearms were still encased in concrete that needed to be removed. Horn then obtained two five-gallon buckets of two different glycolic acid formulas. To avoid destroying the evidence, Horn experimented with the best way to remove the concrete by mixing her own concrete and encasing two partially disassembled firearms inside. After the concrete had cured for two months, she broke the firearms out and used the glycolic acid formulas to remove the concrete and assess whether there would be any damage to the firearms, which would render them nonfunctional for fire comparison. After a couple of months doing that, it was determined that the glycolic acid would not damage the firearms.

¶ 42    Horn then proceeded to work on each of the firearms in this case individually. Horn spent "approximately three or four months" "every day or every other day" soaking the firearms in the glycolic acid, rinsing them, and then "using dental picks and small hammers" to remove the concrete from the takedown pin. Horn's goal in removing the concrete was to be able to remove the bolt carrier group from each firearm so it could be put in another rifle to generate test shots. Horn testified that "it took between four and five months per gun" to be able to remove the bolt carrier group from each firearm. After the bolt carrier groups were removed from the firearms, Horn fired test shots from each gun. Horn's official findings were inconclusive as to whether any of the three guns fired the seven cartridges on Dillinger Road. Horn reported that some of the characteristics were similar, but there was damage that "could have been due to the fact that it was encased in concrete and some fluid had gotten in there." Horn stated that "over time those kinds

16

of changes can cause significant changes in the kind of reproduction you get in microscopic patterns on your fired evidence."

¶ 43    In the second block of concrete, Horn located a 9-millimeter Luger intact cartridge that was in the box, and multiple cartridges on the bottom. However, "based on the fact that the cartridges were on top of each other and in all different kinds of configurations," it was not safe to try to chip away at the block to remove the cartridges. Horn explained it was unsafe for her to try to remove the cartridges because "the wrong chip could impact a primer which is going to make that cartridge go off which is going to blow-up the whole block." As a result, the examination was suspended.

¶ 44    After the State rested, the defense moved for a directed verdict, which was denied by the trial court. The defense then called Xavier McCray, who testified that he drove from Kansas to Illinois in the white Ford truck. He indicated that on the evening of July 31, 2016, he was driving the Grand Prix with Karcher as the passenger. McCray stated that the defendant was not in the car during the police chase. McCray further stated that he spoke with Brandon by phone during the police chase.

¶ 45    During cross-examination, McCray acknowledged that he spoke with the prosecutor before trial. The State asked McCray when he came up with the story that the defendant was not in the Grand Prix, because when he spoke to the prosecutor, he said that the defendant was in the car. McCray stated that he did not change the story he told the prosecutor; he meant that the defendant was in the Grand Prix prior to the shooting, not that the defendant was in the car during the shooting. McCray also denied lying, despite acknowledging he had lied to police when he said he had never been to Illinois. McCray testified that he did not recall telling officers that he did not see Karcher shoot a gun, but if he did, that would have been a lie. McCray also denied telling the prosecutor that he had told the defendant to run after he, McCray, was arrested in 2018, or that he

17

had said he was testifying to help his friend. McCray agreed that it was his first time telling anyone that the defendant was not in the car. Following McCray's testimony, the defense rested. After the closing argument, the jury found the defendant guilty of all three counts.

¶ 46    On July 1, 2024, the court denied defense counsel's motion to vacate the jury's findings of guilt or, in the alternative, defendant's motion for a new trial. The trial court then sentenced the defendant to 24 years for aggravated battery with a firearm, 13 years for aggravated discharge of a firearm at a peace officer, and 12 years for cannabis trafficking. Thereafter, the defendant, through counsel, timely filed his notice of appeal.

¶ 47                                          II. ANALYSIS

¶ 48    On appeal, the defendant argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm and aggravated discharge of a firearm at a peace officer under a theory of accountability. To sustain a conviction for the offense of aggravated battery with a firearm, the State needed to prove that (1) the defendant, or one for whose conduct he was legally responsible, knowingly caused injury to another person; (2) the defendant, or one for whose conduct he was legally responsible, did so by discharging a firearm; (3) the defendant, or one for whose conduct he was legally responsible, knew that the other person was a peace officer; and (4) the defendant, or one for whose conduct he was legally responsible, did so while the peace officer was engaged in the execution of his official duties. 720 ILCS 5/12-3.05(e)(2), (h) (West 2016). To sustain a conviction for the offense of aggravated discharge of a firearm at a peace officer, the State needed to prove that (1) the defendant, or one for whose conduct he was legally responsible, knowingly discharged a firearm; (2) the defendant, or one for whose conduct he was legally responsible, discharged a firearm in the direction of a vehicle; (3) the defendant, or one for whose conduct he was legally responsible, knew that the vehicle was occupied by a peace officer;

18

and (4) the defendant, or one for whose conduct he was legal responsible, did so while the peace officer was engaged in the execution of his official duties. *Id.* § 24-1.2(a)(4), (b).

¶ 49    When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* Circumstantial evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 50    There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Saxon*, 374 Ill. App. 3d at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416.

¶ 51    In this case, the defendant asserts that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm and aggravated discharge of a firearm under a theory of accountability. The defendant argues that the evidence did not establish that he was present in, or driving, the vehicle at the time of the shooting. According to the defendant, the State offered no physical or forensic evidence linking him to the vehicle, no eyewitness identified him

19

in the vehicle during the shooting, and he made no confession. Instead, the State's case relied entirely on Brandon's testimony, which was given pursuant to a plea agreement. The defendant further maintains that Brandon's account was directly contradicted by McCray, who testified that the defendant was neither the driver nor a passenger in the vehicle during the shooting. Based on these deficiencies, the defendant contends that no rational trier of fact could have found him guilty of the firearm-related offenses, as the State failed to prove that he aided or participated in the commission of the crime.

¶ 52 In response, the State argues that the evidence was sufficient to sustain the defendant's conviction under a theory of accountability, asserting that, when viewed in the light most favorable to the prosecution, it demonstrated his active involvement in the events leading to the shooting of Officer Harris. The State maintains that the defendant aided and facilitated the offense by traveling to Illinois with armed associates, participating in efforts to recover stolen cannabis, and driving the vehicle used during the shooting. It contends that accountability was established through the testimony of Brandon, DJ, and Jared, and that this testimony was corroborated by evidence collected by crime scene investigators. In particular, the State contends that the testimony of Brandon and DJ placing the defendant as the driver of the Grand Prix on the day of the shooting and in the days leading up to it, as well as an active participant, was corroborated by ballistics evidence linking multiple firearms to the vehicle and the related crime scenes. Additionally, the State argues that the defendant was accountable under the common criminal design rule, emphasizing that he knowingly joined a group intent on retaliating against those who stole their cannabis, remained with the group throughout the relevant events, and fled afterward, reflecting both participation and consciousness of guilt. Finally, the State rejects the defendant's challenge to Brandon's credibility, asserting that his testimony was consistent with the overall evidence and

more reliable than McCray's account, which it characterizes as inconsistent, newly asserted, and contradicted by other testimony.

¶ 53    In reply, the defendant maintains that the State failed to prove him guilty beyond a reasonable doubt and reiterates that the evidence was insufficient. He reiterates that the State's case rests almost entirely on Brandon's testimony, whose credibility is suspect due to his plea agreement, and that this testimony was directly contradicted by McCray. The defendant further contends that the State's common criminal design argument is "inconsequential," asserting that because he was not in the vehicle at the time of the shooting, "the State could not prove that [he] was legally accountable for the actions of the shooter." Despite the fact that the trial testimony "revealed that [the defendant] drove to Illinois to recover stolen cannabis." The defendant further emphasizes that there was no evidence at trial that he solicited the shooting or was "involved in any advanced planning or had a prior intent to facilitate the shooting of Officer Harris."

¶ 54    A defendant is accountable for another's crime when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016). To prove that a defendant possessed the intent to promote or facilitate the crime, the State must prove beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). In determining accountability, the trier of fact may consider the defendant's presence during the commission of the offense, his flight from the state after the offense, his continued affiliation with other offenders after the crime, and his failure to report the crime. *Id.* at 267. Evidence that the defendant voluntarily attached himself to a group

21

bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Id.*

¶ 55     Viewing the evidence in the light most favorable to the State, we conclude the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt under a theory of accountability. The evidence showed that the defendant was a part of the armed effort to recover the stolen cannabis and actively participated in the events that led to the shooting of Officer Harris. The defendant traveled from Kansas to Illinois with his associates after learning of the underpayment for the cannabis. Upon his arrival, he joined in the organized effort to locate those responsible, which involved multiple individuals, vehicles, and firearms. Testimony established that firearms were displayed and used during this effort, including the firing of a gun at a residence of Ju-Ju's aunt. The defendant was not a passive observer; rather, he was actively involved in the operation, including driving the Grand Prix for much of the search and remaining in communication with others as the group coordinated its movements over multiple days.

¶ 56     The evidence further showed that the shooting of Officer Harris occurred during the armed search. On the night of the shooting, the group loaded firearms into the Grand Prix before continuing their search for the stolen cannabis. When the marked police vehicle, with activated emergency lights and sirens, began pursuing the Grand Prix, a gun was fired from the vehicle at the pursuing officers. Given the ongoing nature of the armed effort to recover the cannabis and evade detection, the jury could have reasonably concluded that the shooting was a direct extension of that common criminal design. The use of firearms to advance the group's objective, including to avoid apprehension, was entirely consistent with the group's conduct throughout their efforts to recover the cannabis. The testimony was corroborated by forensic evidence, which linked the armed activity at the stash house and earlier shooting scenes to the same firearms involved in the

22

Dillinger Road shooting and the recovered casing found in the Grand Prix. The forensic evidence and testimony regarding the disposal of the weapons in concrete further demonstrated the efforts of the group to conceal the evidence of the group's armed activity.

¶ 57   The jury was not required to find that the defendant personally fired the weapon or was definitively identified as being inside the Grand Prix at the precise moment of the shooting in order to impose accountability. Even though there was conflicting testimony regarding the defendant's presence in the Grand Prix, the jury could have reasonably inferred the defendant's continued participation in the criminal activities based on his actions before and after the shooting. The defendant helped initiate and sustain the armed search for the cannabis. He drove the Grand Prix during the search for the cannabis and remained in communication with those involved after the shooting. He returned to the stash house after the shooting and subsequently fled the area and ultimately the state with the individuals involved in the shooting. These actions support a reasonable inference that he remained part of the ongoing criminal enterprise at the time of the shooting and long after.

¶ 58   The jury was also entitled to resolve credibility issues in the State's favor because the weight to be given to a witness's testimony, the credibility of that witness, the resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). While McCray testified that the defendant was not in the Grand Prix, he admitted to prior inconsistent statements and acknowledged that the trial was the first time he had made the claim. In contrast, the accounts of Brandon and DJ were largely consistent with each other and with the physical evidence recovered by law enforcement. Although some of the witnesses had potential motives to testify favorably for the State, the jury was aware of those factors and was entitled to

credit their testimony. It is not the role of a reviewing court to substitute its judgment for that of the jury on issues of witness credibility.

¶ 59 Lastly, the evidence supported a finding that the occupants of the Grand Prix knew they were firing at a peace officer. The testimony established that the pursuing vehicle was a marked squad car with its emergency lights and sirens activated. From this, the jury could have reasonably inferred that those in the Grand Prix were aware of the officer's identity when they fired the shots at the vehicle.

¶ 60 Taken together, the circumstantial, physical, and testimonial evidence established that the defendant knowingly participated in a coordinated, armed criminal undertaking which led to the shooting of Officer Harris. Accordingly, the evidence was sufficient to support the convictions, and no basis exists to disturb the jury's verdict.

¶ 61                                      III. CONCLUSION

¶ 62 For the foregoing reasons, we affirm the judgment of the trial court.


¶ 63 Affirmed.