2026 IL App (2d) 250391-U
No. 2-25-0391
Order filed June 11, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

Lisa J. Eller, Defendant-Appellant.

Appeal from the Circuit Court of Kendall County.
Honorable Jody P. Gleason, Judge, Presiding.
No. 23-CF-480

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence presented at trial was sufficient to support defendant's conviction of felony disorderly conduct, where circumstantial evidence supported the inference that defendant knew, when she contacted the police to report a crime, that no offense had occurred.

¶ 2    Defendant, Lisa J. Eller, was charged by indictment with one count of disorderly conduct after she reported to police that her debit card had been fraudulently used, despite allegedly knowing at the time that there was no reasonable ground for believing such an offense had been committed.  See 720 ILCS 5/26-1(a)(4) (West 2022).  Defendant appeals, arguing that the evidence was insufficient to prove her mental state beyond a reasonable doubt.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On February 27, 2024, defendant was charged with violating section 26-1(a)(4) of the Illinois criminal code, a class 4 felony. *Id.* Defendant waived her right to a twelve-person jury, and the case proceeded to trial with a six-person jury on April 9, 2025. The State called Yorkville police officer Nicholas Mertes and police detective Jeffery Johnson to testify. Defendant testified on her own behalf.

¶ 5     Mertes testified that he was on duty as a patrol officer on October 19, 2023. At 7:30 p.m., he met with defendant in the parking lot of the Yorkville police station. Defendant opened the banking app on her cell phone and showed Mertes four transactions on her bank account that she stated were fraudulent. Mertes took photographs of each transaction that she showed him on her phone. Mertes identified the four photographs in court, and they were admitted into evidence. The photographs in evidence show that the following ATM withdrawals occurred on September 30, 2023, at the times listed below:

> "$102.99 *** ATM W/D 1740 [*i.e.*, 5:40 p.m.] 09/30/23"
>
> "$202.99 *** ATM W/D 1748 [*i.e.*, 5:48 p.m.] 09/30/23"
>
> "$102.99 *** ATM W/D 1801 [*i.e.*, 6:01 p.m.] 09/30/23"
>
> "$202.99 *** ATM W/D 1805 [*i.e.*, 6:05 p.m.] 09/30/23"

All four bank transactions, as displayed on defendant's phone, showed the location of the ATM as "JAVA JILLS 3 2635 N BRIDGE ST YORKVILLE IL."

¶ 6     On cross-examination, Mertes agreed that defendant told him she had received alerts from her bank about fraudulent activity. He also agreed that the photographs showed four ATM withdrawals conducted at "Java Jills." When asked whether he knew at the time that Java Jills and Tracy's were "the same establishment," he said no.

¶ 7    The parties then stipulated that, if called to testify, Kevin Willis would testify to that he was currently employed as director of security at J and J Gaming Ventures and was familiar with the security cameras at the Tracy's gaming establishment located at 2635 North Bridge Street in Yorkville. Based on a request from Johnson, a J and J employee sent video footage from the security cameras at Tracy's, recorded on September 30, 2023, to Johnson. The parties next stipulated to the accuracy of the videos, and four video clips were admitted into evidence without objection from defendant.

¶ 8    The State then called Johnson to testify. He stated that, in the fall of 2023, he was assigned to investigate the ATM transaction that defendant reported as fraudulent. As a first step in the investigation, he used the address listed on the photographs of the bank transactions to determine that he needed to request surveillance footage from Tracy's. He was aware that Tracy's had previously been a gaming establishment called Java Jills.

¶ 9    The State played one of the videos in court, and Johnson agreed that it showed defendant and an unidentified man getting out of a truck and walking into Tracy's. Johnson went on to identify defendant in video footage showing the ATM located inside Tracy's. The timestamped footage showed defendant making withdrawals from the ATM on September 30, 2023, at 5:40 p.m., 5:48 p.m., 6:01 p.m., and 6:05 p.m. Johnson went on to testify that the times of defendant's four ATM withdrawals as shown on the surveillance footage matched up with the times of the four disputed transactions as shown in her banking app. Johnson agreed that the four transactions totaled $600, plus service fees, and that the four transactions took place in less than 30 minutes.

¶ 10    Johnson testified that, after viewing the surveillance footage, he had contact with defendant in October and November of 2023. During that time, defendant agreed to at least three voluntary interviews with Johnson, but she either canceled or failed to attend those appointments. In early

November, Johnson went to defendant's home to try to speak with her, but no one answered the door, so he "left a business card *** for her to contact [him]." The State filed a complaint against defendant on December 14, 2023, alleging that she was guilty of disorderly conduct. On December 19, 2023, defendant left several voicemails for Johnson. The State entered into evidence one of those voicemail recordings. Johnson confirmed that, in that recording, defendant apologized for "blowing [him] off."

¶ 11 On cross-examination, Johnson confirmed that he reviewed Mertes's report before he began working on the case. He also confirmed that the report referenced only "Java Jills," and that "Tracy's" was never mentioned by name. Nonetheless, when Johnson began his investigation on October 23, 2023, he was aware that Tracy's had previously been Java Jills. Johnson never informed defendant of that fact. Johnson was unaware that ATM transactions conducted from Tracy's were identified as having occurred at Java Jills. Johnson agreed that, even after he viewed the surveillance videos of the ATM withdrawals, defendant was not suspected of committing any crime.

¶ 12 On redirect, Johnson said that defendant left him a voicemail saying that "she frequents Tracy's and was not aware that it was called Java Jills prior to that." On recross, Johnson said that he viewed the surveillance videos before attempting to set up a voluntary interview with defendant, and that defendant did not know at the time that he had obtained the videos.

¶ 13 At the conclusion of Johnson's testimony, the State rested. Defense counsel made a motion for a directed finding, arguing that the State failed to prove that defendant knew when she contacted police that there was no reasonable ground for believing she had been the victim of fraud. In response, the State emphasized that the surveillance footage showed defendant making four ATM

withdrawals on the same day that the allegedly fraudulent transactions occurred and asserted that the video evidence alone was sufficient to meet its burden of proof. The court denied the motion.

¶ 14 Defendant then testified on her own behalf. She confirmed that the surveillance video showed her taking money out of the ATM at Tracy's on September 30, 2023. When asked why she contacted police, she explained that, on October 1, 2023, she and her husband both received multiple fraud alerts from their bank, via text message. Asked what she did next, defendant replied, "I panicked." Defendant agreed that she did not contact police immediately. Asked why she waited until October 19, defendant said, "I had given my word to [my bank] that I would, but I really didn't feel up to it because I'm ill." On October 19, 2023, defendant happened to see Mertes in line at a Dunkin' Donuts drive-thru and decided to tell him about the disputed transactions. She later showed him the fraud alerts and the transactions as shown on her banking app.

¶ 15 Asked what she believed when she initially contacted police, defendant said, "When I saw Java, I instantly thought of coffee. I can't drink coffee. I wish. So I thought somebody had hacked me for a couple hundred dollars worth of coffee." Asked whether she knew at the time that "Java Jills and Tracy's were essentially the same establishment," defendant said no. And when she was asked if she "subsequently learned from other sources that when you get an ATM receipt [at Tracy's], it says Java Jills," defendant said yes.

¶ 16 On cross-examination, defendant confirmed that she and an unidentified man went to Tracy's to gamble on September 30, 2023. She confirmed that she made multiple withdrawals from the ATM, and that each transaction incurred a $2.99 service fee. She guessed that she probably spent around an hour and a half at Tracy's that day. Asked whether she considered $600 to be "a significant amount of money," defendant said no. She said the bank account she accessed

at the ATM was a joint account for herself and her husband but noted that the account also held money for Alex, the man she was with at Tracy's, "because he had a problem with alcohol."

¶ 17    Defendant went on to explain that she and her husband received the fraud alerts the next day.  She said that the transactions did not appear on her banking app until several days later because "[i]t was the weekend."  Defendant was subsequently questioned about her previous visits to Tracy's:

> "Q. And you heard Detective Johnson discuss that you had said that you're a regular at Tracy's, right?
>
> A. I never said I was a regular. It's not that great of a place actually.
>
> Q. Okay. So you never said that you were a regular at Tracy's in one of the voicemails that you left for Detective Johnson?
>
> A. Oh, no. I said I do go to Tracy's.  It's just not one of my top favorites.
>
> Q. It's not one of your top favorites, but would you consider yourself a regular or somebody who frequents Tracy's?
>
> A. I did about six times.  I don't consider that a huge frequent, but it depends on your opinion.
>
> Q. Okay.  I'm just asking what you said to Detective Johnson in that voicemail.
>
> You describe yourself as somebody who frequently goes to Tracy's.
>
> ***
>
> "Q. Okay. Now, prior to September 30th of 2023, how many times had you been to Tracy's before that?
>
> A. Let's see, this is going back a ways.  Give me a second here.  Probably eight or nine.

Q. Okay. And when did you start going to Tracy's? A year?

A. They sent us a postcard for free $20 or something or $10 a piece to me and my husband. And I'd say that was about, I don't know, a couple years ago.

Q. Okay. How many years ago did you start going to Tracy's?

A. Two-and-a-half, three.

Q. Okay. And prior to September 30th of 2023, had you used the ATMs at Tracy's?

A. Yes.

Q. Okay. So you've used—you used the ATM prior to September 30th of 2023?

A. Yes.

Q. And on those prior occasions, you never reported that what was on your banking app, the Tracy's location, was fraudulent, correct?

A. Correct. I never got a fraud alert.

Q. Okay. So the only thing that prompted you to think that something was wrong was a fraud alert, right?

A. Yes, because of the word Java, meaning coffee.

Q. Okay. So prior to September 30th of 2023, the transactions, the ATM transactions that you did at Tracy's, you never reported, correct?

A. You mean, why would I report it? I don't understand the question.

***

Q. Okay. And you didn't think to research anything with regard to $600 being pulled out of your account for September 30th of 2023 at Java Jills, correct?

A. No. Because that's, at that time in my life was nothing. It was like pulling out $20. It was nothing.

Q. Okay.

A. My mother had passed away, and I was gambling. Sorry, too much information."

¶ 18    Asked about the missed meetings with Johnson, defendant confirmed that she left Johnson a voicemail where she "apologized for blowing him off." When asked whether she knew that Johnson had been trying to get a hold of her, defendant replied, "Yes, and no. He broke the first appointment, and he knew why I didn't make the other appointments." Defendant said she did not attend the meetings because she didn't feel well and because "it was a couple hundred dollars, and [she] didn't care." Asked again about the missed appointments, defendant said, "The first time [Johnson] cancelled when I was available, and then afterwards then I didn't come. And then he told me on the phone, ['Defendant], you have to come in or I'm not going to sign off on the police report.['] And I said F it, excuse my language."

¶ 19    Following defendant's testimony, the defense rested. The State called Johnson in rebuttal. Johnson said that he never told defendant that he refused to sign the police report unless she called him back. When asked whether he had canceled any of the appointments with defendant, he replied, "Absolutely not."

¶ 20    After closing arguments, the jury found defendant guilty of disorderly conduct. The court imposed an agreed-upon sentence of 24 months' probation. This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, both parties agree that the transactions at issue were not, in fact, fraudulent. Defendant argues only that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that she knew *when she contacted police* that there was no reasonable ground for believing she was the victim of fraud. She therefore asks this court to reverse her conviction of

disorderly conduct. In response, the State argues that the evidence was sufficient to support the conviction. We agree with the State.

¶ 23 At trial, the State needed to prove, beyond a reasonable doubt, that defendant knowingly transmitted "in any manner to any peace officer, public officer or public employee a report to the effect that an offense *** ha[d] been committed, knowing at the time of the transmission that there [was] no reasonable ground for believing that the offense *** ha[d] been committed." See 720 ILCS 5/26-1(a)(4) (West 2022).

¶ 24 When reviewing a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The critical inquiry is whether the evidence could reasonably support a guilty finding, regardless of whether the evidence is direct or circumstantial. *People v. Lissade*, 403 Ill. App. 3d 609, 612 (2010).

¶ 25 As our supreme court has explained,

"Knowledge is often proven by circumstantial evidence rather than direct proof because it is the mental element of an offense and, as such, is rarely proven by direct evidence. [Citation.] An admission by a defendant is not required for the trier of fact to conclude that a defendant had knowledge of something." *People v. Leib*, 2022 IL 126645, ¶ 37.

¶ 26 Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). A criminal conviction may be based solely on circumstantial evidence. *People v. Brown*, 2013 IL 114196, ¶ 49. The jury does not need to be satisfied beyond

a reasonable doubt as to each link in the chain of circumstances; rather, it "must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Of particular relevance here, the jury "is not required to disregard inferences that flow normally from the evidence before it, *nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt*." (Emphasis added.) *Id.*

¶ 27 The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. See *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). "Because the trier of fact is best positioned to judge the credibility of the witnesses and resolve disputes in the evidence, its decision is entitled to great deference." *Lissade*, 403 Ill. App. 3d at 612. We will not reverse a conviction on sufficiency grounds unless the evidence was so "unreasonable, improbable, or unsatisfactory" that, even when viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 28 Here, the jury concluded that defendant knew when she contacted police that there was no reasonable ground for believing she was the victim of fraud. We find that the circumstantial evidence presented by the State at trial was sufficient to support that conclusion. For instance, defendant received the fraud alerts from her bank the day after the ATM transactions occurred. She was aware of her own ATM withdrawals, and she testified that she was also aware of the $2.99 service fee for each ATM transaction at Tracy's, so she could have recognized the transactions as her own prior to reporting the suspected fraud to police based on the matching dollar amounts. She also testified that she had visited Tracy's on eight or nine previous occasions and that she had used the ATM on at least some of those occasions (meaning that defendant would have previously

seen transactions attributed to "Java Jills" if she looked at her banking app or bank account statements), yet she did not report any of those transactions as fraudulent.

¶ 29    As for the disputed transactions, the surveillance videos show defendant looking at the ATM receipts for her withdrawals, and defendant may have observed at the time that those receipts listed the name "Java Jills." Further, although the allegedly fraudulent transactions appeared on her banking app with the name Java Jills, the banking app listed Tracy's address, so she might have searched the address and identified Tracy's as the source of the transactions. The jury may have also found it significant that defendant received the fraud alert on October 1 but did not contact the police until October 19. And the testimony of both Johnson and defendant suggests that, after reporting the suspected fraud, defendant avoided contact with the police detective investigating the case. Although defendant argues that "reliance on [her] post-report conduct is misplaced" because her "non-cooperation could reflect that the matter was not significant to her, that she was ill, or that she later learned that Tracy's was formerly Java Jills and realized that the transactions were not fraudulent," the jury need not "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." See *Jackson*, 2020 IL 124112, ¶ 70.

¶ 30    Viewing all of this evidence in the light most favorable to the State, we cannot say that no rational trier of fact could accept it as proof beyond a reasonable doubt. As noted above, the jury is responsible for determining the credibility of witnesses and for deciding what reasonable inferences to draw from the evidence. Based on the circumstantial evidence presented by the State, the jury inferred that defendant knew, when she contacted police on October 19, 2023, that the disputed transactions were not fraudulent. Although defendant testified to the contrary, the jury clearly did not find her testimony credible. Because the evidence presented by the State was

sufficient to prove defendant guilty beyond a reasonable doubt, we find no basis for reversing defendant's conviction.

¶ 31                                      III. CONCLUSION

¶ 32     For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 33     Affirmed.